**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JULIE CONTRERAS, IRVIN FUENTES, ABRAHAM MARTINEZ, IRENE PADILLA, and ROSE TORRES<br><br>                    Plaintiffs,<br><br>v.<br><br>ILLINOIS STATE BOARD OF ELECTIONS, CHARLES W. SCHOLZ, IAN K. LINNABARY, WILLIAM J. CADIGAN, LAURA K. DONAHUE, WILLIAM R. HAINE, WILLIAM M. MCGUFFAGE, KATHERINE S. O'BRIEN, and CASANDRA B. WATSON in their official capacities as members of the Illinois State Board of Elections, DON HARMON, in his official capacity as President of the Illinois Senate, and THE OFFICE OF THE PRESIDENT OF THE ILLINOIS SENATE, EMANUEL CHRISTOPHER WELCH, in his official capacity as Speaker of the Illinois House of Representatives, and the OFFICE OF THE SPEAKER OF THE ILLINOIS HOUSE OF REPRESENTATIVES,<br><br>                    Defendants. | Case No. 1:21-cv-03139<br><br>Circuit Judge Michael B. Brennan<br>Chief District Judge Jon E. DeGuilio<br>District Judge Robert M. Dow, Jr.<br><br>Three-Judge Court<br>Pursuant to 28 U.S.C. § 2284(a) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

i

## TABLE OF CONTENTS

I.   INTRODUCTION………………………………………………………….......1

II.  FACTUAL BACKGROUND……………………………………………………...3

     A.  The Redistricting Process…………………………………………………4

     B.  ACS Data…………………………………………………………………4

     C.  Malapportionment………………………………………………………6

III. LEGAL STANDARD…………………………………………………………..7

IV.  ARGUMENT………………………………………………………………7

     A.  The Enacted Plan is malapportioned, in violation of the 14th Amendment's Equal
         Protection Clause…………………………………………………………7

     B.  Legislative Defendants cannot establish that their malapportionment was the result of a
         rational state policy free from arbitrariness or discrimination…………………………..9

     C.  Even if the State could articulate a rational state policy behind its boundary drawing in
         the Enacted Plan, the deviations in the plan do not meet constitutional standards………11

     D.  The Plan in place before the Enacted Plan took effect is also malapportioned………….11

V.   THE COURT SHOULD DECLARE THE ENACTED PLAN UNCONSTITUTIONAL
     AND ENJOIN ITS USE IN ELECTIONS, AS WELL AS THAT OF THE PLAN IT
     REPLACED………………………………………………………………...12

VI.  CONCLUSION…………………………………………………………..13

# TABLE OF AUTHORITIES

PAGE(S)

Cases

*Baker v. Carr*,
369 U.S. 186 (1962) ............................................................................................. 3

*Brown v. Kentucky Legislative Rsch. Comm'n*,
966 F. Supp. 2d 709 (E.D. Ky. 2013) .................................................................. 4

*Brown v. Thompson*,
462 U.S. 835 (1983) ......................................................................... 3, 10, 11, 12

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................................ 8

*Connor v. Finch*,
431 U.S. 407 (1977) .......................................................................................... 12

*Flateau v. Anderson*,
537 F.Supp. 257 (S.D.N.Y.1982) ...................................................................... 14

*Harney v. Speedway SuperAmerica, LLC*,
526 F.3d 1099 (7th Cir. 2008) ............................................................................ 8

*Honsey v. Donovan*,
236 F.Supp. 8 (D.Minn.1964) ........................................................................... 14

*Logan v. Commercial Union Insurance Co.*,
96 F.3d 971 (7th Cir. 1996) ................................................................................ 8

*Mahan v. Howell*,
410 U.S. 315 (1973) .................................................................................... 11, 13

*Reynolds v. Sims*,
377 U.S. 533 (1964) ................................................................................... passim

*Roman v. Sincock*,
377 U.S. 695 (1964) .......................................................................................... 11

*White v. Regester*,
412 U.S. 755 (1973) .......................................................................................... 11

Statutes

PL 94-171, 89 Stat. 1023 (1975) .............................................................................. 2, 6, 7

Rules

Fed. R. Civ. P. 56(a) ...................................................................................................... 8

Rule 56 ........................................................................................................................... 8

## I.    INTRODUCTION

The United States Constitution requires a census to enumerate every person in the country every ten years. Art. I, sec. 2, U.S. Constitution; PL 94-171, 89 Stat. 1023 (1975). Under PL 94-171, Congress requires the Census Bureau to submit population tabulations to each state, including data at the Census block level that states require for redistricting. PL 94-171. The 2020 Census PL 94-171 data were released to the states on August 12, 2021. It is this data that states are expected to use, and have historically used to conduct redistricting.  It is *not* the population data the state of Illinois used.

On May 28, 2021, the Illinois General Assembly, including Defendants Illinois Speaker of the House Don Harmon and Illinois Senate President Emanuel Christopher Welch ("Legislative Defendants"), enacted legislative redistricting plans for the Senate and General Assembly (Enacted Plan), which were signed into law by Governor J.B. Pritzker on June 4, 2021.  Rather than wait for the decennial Census population counts, the Illinois Legislature used population estimates derived from the American Community Survey (ACS) to draw the boundaries for state senate and house districts. The ACS data is not a tabulation of the population.  The Illinois Legislature produced the Enacted Plan with estimated numbers, which ultimately revealed large deviations from the ideal population districts in the state's legislative map, according to the actual population count in the 2020 Census.

Malapportionment, or, the creation of voting districts with unequal populations, is unconstitutional because it allows some constituents to count more than others. *Reynolds v. Sims*, 377 U.S. 533 (1964); *see also Baker v. Carr*, 369 U.S. 186 (1962). The Supreme Court established the one-person one-vote principle for state legislative redistricting in *Reynolds v. Sims*, to ensure that the voices of residents in malapportioned districts would not be diluted.  *Id.*

There, the Supreme Court held that state legislatures must maintain equipopulous legislative districts despite other factors the state might think are important in apportioning representation. The Court noted that, "as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State." *Reynolds v. Sims*, 377 U.S. 533, 568 (1964). Deviations from the ideal population in a district signal malapportionment, and maximum deviation percentages beyond 10% signal unconstitutional malapportionment. *See Brown v. Thompson*, 462 U.S. 835, 842-43 (1983).

Plaintiffs are Latino voters in malapportioned districts throughout the state of Illinois. Because Legislative Defendants created and maintain a legislative redistricting plan that is unconstitutionally malapportioned, Plaintiffs are entitled to judgment as a matter of law. First, the State of Illinois effectuated the Enacted Plan with invalid data that ultimately produced a plan that, using decennial Census data, is malapportioned as a matter of undisputed fact. The overall variance, or maximum deviation, in the Enacted Plan approaches 30%.[1] This means that there is a 30% difference between the largest and the smallest districts' respective deviations from the ideal district population in the plan. Second, the Enacted Plan replaced a plan that itself is malapportioned because of the population changes in Illinois since the 2010 Census. Third, Legislative Defendants cannot articulate a rational state policy that explains the deviations in the

---

[1] "To determine the maximum deviation percentages that are relevant to the Equal Protection Clause analysis, the court must: (1) calculate the ideal legislative district by dividing the total population by the number of legislative districts; (2) identify the districts of the challenged plan with the largest deviations above and below the ideal legislative district; and (3) measure the difference between the deviations of those districts." *Brown v. Kentucky Legislative Rsch. Comm'n*, 966 F. Supp. 2d 709, 722 (E.D. Ky. 2013), *judgment entered*, No. CV13CV25DJBGFVTWOB, 2013 WL 12320875 (E.D. Ky. Oct. 31, 2013) (internal citations omitted).

Enacted Plan because its deviations are the result of using invalid data to create its plan. Fourth, even if they could come forward with a rational state policy to explain its deviations, the maximum deviations in this case go beyond the tolerable limits federal courts have found acceptable.

The Court should grant Plaintiffs' motion for summary judgment and declare the Enacted Plan, as well as the legislative map it replaced, unconstitutional. The Court should enjoin Defendants Illinois State Board Of Elections, Charles W. Scholz, Ian K. Linnabary, William J. Cadigan, Laura K. Donahue, William R. Haine, William M. McGuffage, Katherine S. O'Brien, And Casandra B. Watson ("State Board of Elections Defendants") from calling, holding, or certifying any future election based on the Enacted Plan and establish a schedule for the creation of a legislative district plan that adheres to constitutional and legal requirements.

## II.     FACTUAL BACKGROUND

The material facts are more fully set forth in Plaintiffs' Statement of Material Facts Pursuant to Local Rule 56.1(a)(3) (hereinafter "SOF ¶ __").  Plaintiffs summarize those facts briefly here for background purposes.

Plaintiffs are Latino voters in malapportioned districts throughout the state of Illinois who seek to protect their voting rights by enjoining the Enacted Plan for the election of legislators in the state. SOF ¶ 1-5. The Enacted Plan was developed by Legislative Defendants in the Spring 2021.  SOF ¶ 26. The Legislative Defendants did not use Census enumeration data to draw the boundaries in its Enacted Plan. SOF ¶ 20.  Instead, they used American Community Service Data, which the Census Bureau does not recommend for use in population-based activities. ¶ 20.

The result was an unconstitutionally malapportioned map, the degree to which is verified by comparison to the actual population count in the 2020 Census. SOF ¶ 34, 35, 36, 37, 38, 39.

### A.  The Redistricting Process

The Illinois Constitution governs redistricting each cycle.  ILL. CONST. art. IV, § 3(b). The Constitution establishes the following process: If a new legislative redistricting map is not passed by the General Assembly and signed into law by the Governor before June 30 in the year following the decennial census, a Legislative Redistricting Commission (the "Redistricting Commission") will be created on or before July 10.  *Id.*  If a Redistricting Commission fails to file a plan on or before August 10, the Supreme Court must submit the names of two persons, not of the same political party, to the Secretary of State on or before September 1. *Id.* On or before September 5, the Secretary of State must publicly and randomly choose the name of one of the two persons nominated by the Illinois Supreme Court to serve as the ninth member of the Redistricting Commission.  ILL. CONST. art. IV, § 3(b).  On or before October 5, the newly constituted commission must file a redistricting plan with the Secretary of State.  *Id.*

On May 28, 2021, the General Assembly passed House Bill 2777 and Senate Floor Amendment 1 and sent the Enacted Plans to Governor Pritzker for approval. SOF ¶ 26. The Governor signed the Enacted Plans into law on June 4, 2021. SOF ¶ 27.

### B.  ACS Data

The General Assembly and Legislative Defendants used data from the American Community Survey ("ACS") five-year estimates for 2015-2019 and "other election data" to draw the boundaries for the districts used to elect members of the General Assembly. SOF ¶ 20. The Enacted Plans are not based on 2020 Census data (i.e., the P.L. 94-171 data file), which are actual enumeration data SOF ¶ 22.

The ACS data has other characteristics that distinguish it from actual enumeration data. ACS data are released in one-year and five-year estimates. SOF ¶ 21. One-year estimates are available for populations of at least 65,000. SOF ¶ 21. The Census Bureau combines five consecutive years of ACS data to produce multiyear estimates for geographic areas with fewer than 65,000 residents. SOF ¶ 21. Because one-year estimates are not suitable for populations under 65,000, redistricting maps drawn with ACS data, such as the Enacted Plans, require the use of five-year estimates. SOF ¶ 21. In contrast, P.L. 94-171 data are more current. P.L. 94-171 data captures a snapshot in time (i.e., the population on April 1, 2020), but the Enacted Plans use population estimates that span from 2015-2019. SOF ¶ 22.

ACS data are not available for census blocks, the smallest geographical units used in redistricting. SOF ¶ 23. Rather, ACS estimates are available only at the "block group" level. Block groups typically contain between 600 and 3,000 people. SOF ¶ 23. Although the ACS is designed to provide reliable estimates using one year of data for areas with populations over 65,000, which includes all states and many counties, multiple years of data must be aggregated in order to obtain data for smaller areas, such as block groups. SOF ¶ 23. The ACS does not produce data for census blocks because the populations in question are too small to estimate accurately. SOF ¶ 23. Only an enumeration can measure the population of census blocks.

### C. The Malapportionment

The malapportionment in the Enacted Plan is evident through an analysis of the 2020 PL 94-171 redistricting data compared to the plan. SOF ¶ 34. The 2010 PL94-171and 2020 redistricting data file has data by Census Block. SOF ¶ 33.

The overall range of deviation as calculated by Plaintiffs' expert, David R. Ely, are as follows:

| Dataset | Senate Overall Range | House Overall Range |
|---|---|---|
| 2020 PL-94-171 | 20.3% | 29.9% |

SOF ¶ 34

Senate District 3 has a deviation of 12.3%. SOF ¶ 35.

Senate District 42 has a deviation of -7.9%.   SOF ¶ 36.

House District 5 has a deviation of 15%.  SOF ¶ 37.

House District 83 has a deviation of -14.9%.  SOF ¶ 38.

The calculations produced by the foregoing analysis reveal an overall variance, or a maximum deviation in the Enacted Plan approaching 30%. SOF ¶ 39.

## III.    LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A party may seek summary judgment with respect to all or any part of a claim. Fed. R. Civ. P. 56(a).

Federal Rule 56 gives the moving party the initial burden of explaining the basis of its motion, including "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).   The non-moving party then "bears the burden of demonstrating that such a genuine issue of material fact exists." *See Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (internal citation omitted).

"If no genuine issue of material fact exists, the sole question is whether the moving party is entitled to judgment as a matter of law." *Logan v. Commercial Union Insurance Co.*, 96 F.3d 971, 978 (7th Cir. 1996).

## IV.    ARGUMENT

In this case, the parties do not contest that ACS data was used to create the district boundaries in the Illinois Enacted Plan. SOF ¶ 20. The parties do not dispute the numbers of residents allocated to each district under the Enacted Plan. SOF ¶ 26, 27. The parties do not dispute that the 2020 Census provides the actual population totals on which apportionment is based. SOF ¶ 22. The parties do not dispute that the population numbers projected in the ACS estimates are different from those in the 2020 Census PL Data File. ¶ 26, 27.

Comparing the actual population totals with the districts created in the Enacted Plan demonstrate as a matter of law malapportionment beyond accepted standards under the Equal Protection Clause of the 14th Amendment.

### A.  The Enacted Plan is malapportioned, in violation of the 14th Amendment's Equal Protection Clause.

The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution "requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." *Reynolds v. Sims*, 377 U.S. 533, 568 (1964). It also prohibits "diluting the weight of votes because of place of residence." *Id.* at 566.  This one-person, one-vote mandate ensures the principle of equal representation.  *See id.* at 577. The Enacted Plan violates this principle. A comparison of the Enacted Plan with data from the actual counts in the 2020 Census demonstrates that as a matter of law the districts under the Enacted Plan are unconstitutionally malapportioned.

For the Illinois Senate districts, the ideal apportionment would have been 217,161 residents per district, according to the 2020 Census PL File data.  SOF ¶ 39.  The overall

variance (or the maximum deviation) between the largest and smallest number of residents per Senate district is under the legislative map is 20.3%. SOF ¶ 34.

With respect to House districts, the ideal apportionment, according to the 2020 Census count, would have been 108,581 residents per Representative district. SOF ¶ 39. The overall variance between the largest and smallest number of residents per House district in the Enacted Plan is 29.9%. SOF ¶ 34.

While courts have held that legislative plans with minor deviations—such as those with a maximum 10% deviation—may be constitutionally valid, maps with larger deviations—such as those in the Enacted Plan—create a *prima facie* case of discrimination, in violation of the Equal Protection Clause. *Brown v. Thompson*, 462 U.S. at 842-43.

The Equal Protection Clause requires "that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Reynolds v. Sims*, 377 U.S. 533, 577 (1964). The proper way to realign Illinois residents into equipopulous districts is to take account of population counts, especially those counts at the census block level or lower. To determine whether the legislature has complied with the one-person one-vote mandate, the court must look to a population basis. The Census is the only vehicle that provides actual population counts, and the only vehicle for measuring population at the census block level. Legislative Defendants did not wait for the release of the 2020 Census count to draw its districts. SOF ¶ 26. SOF Instead, Legislative Defendants drew a legislative map based on disaggregated American Community Survey data of population *estimates* over a five-year period (2015-2019). SOF ¶ 20. Those estimates fail to approximate an actual enumeration because the five-year period estimates are simply an average of one-year estimates over five years. SOF ¶ 22.

The ACS is woefully inadequate to the task of apportioning district boundaries because of the nature of its data. The Census Bureau clearly states that users should not rely on the ACS data for population counts. SOF ¶ 24. The decennial Census, not the ACS, provides the official population counts for states. SOF ¶ 25.

It is undisputed that the ACS data is unreliable at the substate level, even if its numbers did not differ much from the official Census numbers at the statewide level. SOF ¶ 23. The import of using ACS data instead of official Census data can be seen in the percentage deviation from the ideal of each district in the state. SOF ¶ 39. Courts have cautioned states to ensure that districts are as equipopulous as possible to ensure that individuals have equal voting power. Although small deviations are allowable, the Supreme Court has held that a deviation of 10% from an ideal population district –in this case, approaching 30% – is a prima facie violation of the Equal Protection Clause. *See Brown v. Thompson*, 462 U.S. at 842; *see also White v. Regester*, 412 U.S. 755, 764 (1973).

### B. Legislative Defendants cannot establish that their malapportionment was the result of a rational state policy free from arbitrariness or discrimination.

"To justify a plan with deviations exceeding the threshold 10%, the state must first demonstrate that its plan 'may reasonably be said to advance a rational state policy,' which is applied in a manner "free from the taint of arbitrariness or discrimination." *Brown v. Thomson* at 843 (citing *Mahan v. Howell*, 410 U.S. 315, 328 (1973) and *Roman v. Sincock*, 377 U.S. 695, 710 (1964)). Here, the deviations exist, and they are large. The Legislature's Enacted Plan reveals deviations exceeding the 10% threshold in each of the legislative branches, and overall variances (i.e., maximum deviations between the largest and the smallest districts) approaching 30% in each of the plans. On its face, as a matter of law, the Enacted Plan violates constitutional

one-person one-vote principles. Plaintiffs' undisputed evidence of these deviations establishes a prima facie showing of malapportionment in the creation of the Legislature's maps.

Importantly, Legislative Defendants have not shown that the deviations from the ideal population districts in the Enacted Plan are "based on legitimate considerations incident to the effectuation of a rational state policy." *Connor v. Finch,* 431 U.S. 407, 418 (1977) (quoting *Reynolds*, 377 U.S. at 579). Legislative Defendants have not only failed to provide a rational state policy or legitimate considerations for the deviation, they *cannot* provide a reasonable rationale for its decision. They cannot provide a legitimate consideration because the deviations are the result of using invalid data, not because of any deliberation on the part of the Legislature about where specific deviations should apply, or because of any settled principle of reapportionment particular to the state. *See Brown v. Thompson*, 462 U.S. 835, 843 (1983) (upholding a long-standing principle of preserving county boundaries in redistricting as a legitimate state policy). This is precisely the type of arbitrary manipulation of the apportionment system that the malapportionment cases were meant to prohibit.

Legislative Defendants have refused to provide any discovery detailing the Legislature's rationale, motive, or explanation for using the ACS estimates as the foundation for its redistricting attempts. Even without such documentation, however, we can infer the Legislature's motive from its actions. The Legislature seized upon the ACS estimates as the basis of its redistricting attempt before the Illinois Constitution would have turned the task of drawing redistricting lines to a redistricting commission. The Illinois Constitution provides:

> In the year following each Federal decennial census year, the General Assembly by law shall redistrict the Legislative Districts and the Representative Districts. If no redistricting plan becomes effective by June 30 of that year, a Legislative Redistricting Commission shall be constituted not later than July 10.

Illinois Constitution, Article IV, sec. 3. Legislative Defendants' enactment of a plan based on inadequate data was driven by its desire to prevent the constitutional requirement that districts be drawn by a Legislative Redistricting Commission.

**C. Even if the State could articulate a rational state policy behind its boundary drawing in the Enacted Plan, the deviations in the plan do not meet constitutional standards.**

The overall variance between districts in a legislative redistricting plan must fall within constitutional standards, even if the state can identify a rational state policy. There is a point beyond which divergences between districts cannot be tolerated. *See Mahan v. Hall*, 410 U.S. 315, 326 (1973). The Supreme Court has held upheld plans with a justified maximum deviation approaching 17%, but has warned that this percentage "may well approach tolerable limits." *See Mahan*, 410 U.S. at 326. In this case, the 2020 Census PL File data reveals a 29.9% maximum deviation in the House Plan Deviations using PL File Census 2020 data. SOF ¶ 34. It shows a 20.3% maximum deviation in the Senate Plan. ¶ SOF 34. Each of these maximum deviations far exceeds tolerable limits, even if there were a rational state policy in play. They certainly exceed tolerable limits where, as here, a rational state policy does not exist. As a matter of law, Legislative Defendants cannot justify such a gross deviation from the ideal population district.

**D. The Plan in place before the Enacted Plan took effect is also malapportioned**

Until Legislative Defendants and the State of Illinois enacts a valid plan, they will continue to maintain a malapportioned state legislative map. The boundaries of the legislative districts in the original legislative map (in place before the Enacted Plan) are based on the 2010 census, which no longer reflects the population of the state. After the Census numbers were released on

April 26, 2021, the original legislative district map revealed the extent to which the original

legislative map was malapportioned, given that it was created to accommodate 12,864,380

residents from the 2010 census, and the state has since lost 41,641 residents.[2] The 2020 Census

indicates there are now 12,822,739 residents in Illinois, who must be allocated among 59 Senate

and 118 House districts in an equipopulous manner.[3]  The original legislative district map is, in

other words, undeniably out-of-date.

V.      **THE COURT SHOULD DECLARE THE ENACTED PLAN UNCONSTITUTIONAL AND ENJOIN ITS USE IN ELECTIONS, AS WELL AS THAT OF THE PLAN IT REPLACED.**

The Supreme Court has authorized federal courts to take remedial action when districts

are unconstitutionally malapportioned. *See Reynolds*, 377 U.S. at 585 (1964).  In line with such

decisions, Plaintiffs request that the Court grant their motion for summary judgment and enter a

declaratory judgment that Illinois House and Senate districts are malapportioned, and an order

enjoining State Board of Elections Defendants from holding elections under either the Enacted

Plan or its predecessor plan. The Plaintiffs also seek the establishment of a schedule for the

creation of a court-approved plan. Each of these measures is in line with the remedial authority

of the Court, and has been implemented in response to malapportionment vote dilution cases.

*See Honsey v. Donovan*, 236 F.Supp. 8, 15–16 (D.Minn.1964) (then-Circuit Judge Harry

Blackmun writing for a three-judge district court, holding in 1964 that apportionment plan

enacted in 1959 and based on updated 1950 census figures was unconstitutional); *see also*

---

[2] U.S. Census Bureau, Apportionment Population, Resident Population, and Overseas Population: 2020 Census and 2010 Censushttps://www2.census.gov/programs-surveys/decennial/2020/data/apportionment/apportionment-2020-tableA.pdf.

[3] U.S. Census Bureau, State Apportionment Data (April 26, 2021), https://www2.census.gov/programs-surveys/decennial/2020/data/apportionment/apportionment-2020-table01.pdf.

*Flateau v. Anderson*, 537 F.Supp. 257 (S.D.N.Y.1982) (invalidating a 1982 an apportionment scheme enacted in 1974 based on 1970 census data).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for summary judgment, declare the Enacted Plan and the plan it replaced unconstitutionally malapportioned, enjoin Legislative Defendants and State Board of Elections Defendants from using it in future elections, and establish a schedule for a court-approved plan.

Dated: August 20, 2021           Respectfully submitted,

*/s/ Griselda Vega Samuel*
Griselda Vega Samuel (no. 6284538)
Francisco Fernandez del Castillo
(no. 6337137)
Mexican American Legal Defense and
Educational Fund
11 E. Adams, Suite 700
Chicago, IL 60603
Telephone: (312) 427-0701
Facsimile: (312) 588-0782
Email: gvegasamuel@maldef.org
Email: ffernandez-delcastillo@maldef.org

Thomas A. Saenz (*pro hac vice*)
CA State Bar No. 24005046
Ernest Herrera (*pro hac vice*)
CA State Bar. No. 335032
Denise Hulett
CA State Bar No. 121553
Mexican American Legal Defense and
Educational Fund
643 S. Spring St., 11th Fl.
Los Angeles, CA 90014
Telephone: (213) 629-2512
Email: tsaenz@maldef.org
Email: eherrera@maldef.org
Email: dhulett@maldef.org

*Attorneys for Plaintiffs*

13

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2021, a copy of the foregoing document was filed electronically in compliance with Local Rule 5.9.

/s/ Griselda Vega Samuel
*Attorney for Plaintiffs*

14