IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JULIE CONTRERAS, et al., | ) |
|     Plaintiffs, | ) Case No. 1:21-cv-03139 <br> ) <br> ) Circuit Judge Michael B. Brennan |
| v. | ) Chief Judge Jon E. DeGuilio <br> ) Judge Robert M. Dow, Jr. |
| ILLINOIS STATE BOARD OF ELECTIONS, et al. | ) <br> ) Three-Judge Court <br> ) Pursuant to 28 U.S.C. § 2284(a) |
|     Defendants. | ) <br> ) |

**DEFENDANTS WELCH, OFFICE OF THE SPEAKER, HARMON, OFFICE OF THE PRESIDENT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Defendants Emanuel Christopher Welch, Office of the Speaker of the Illinois House of Representatives, Don Harmon, and Office of the President of the Illinois Senate (collectively "Defendants"), by their attorneys, respectfully request this Court deny Plaintiffs' Motion for Summary Judgment. Dkt. # 63, 65.

## Introduction

Plaintiffs' Amended Complaint alleges that Illinois's June 4, 2021 redistricting plan ("June Plan") was malapportioned in violation of the Equal Protection Clause's "one person, one vote" principle and that its districts could not be "sufficiently equipopulous as measured by [the 2020 census data]" because, in the absence of the 2020 census data, it was based on the Census Bureau's 2015-2019 American Community Survey "(ACS") data. Dkt. #37 ¶¶ 2, 6, 57. Plaintiffs ask this Court to enjoin Defendants "from holding elections under either the Enacted Plan or its predecessor plan." Mot. at 9.

Plaintiffs' present motion for summary judgment on those claims is curious and wasteful, because (i) the General Assembly passed an amendment to the challenged June Plan on August 31, 2021 ("Current Plan"); (ii) the Current Plan used the 2020 census data in place of the ACS data; and (iii) there are no malapportionment issues in the Current Plan—as Plaintiffs admitted to this Court. Summary judgment should be denied on this basis alone.

Even setting aside these basic and fundamental flaws, there are two additional reasons, summary judgment should fail. *First*, Plaintiffs have failed to establish—or even allege—that they suffered the individual injury necessary to confer

standing. *Second*, Plaintiffs have failed to establish there is no genuine dispute of material fact regarding the constitutionality of the June Plan, because the General Assembly used ACS data and enacted the June Plan in pursuit of important, legitimate state objectives. And *third*, even if there were a basis for finding the June Plan unconstitutional, the relief that a successful summary judgment motion and subsequent remedial phase would produce *has already been accomplished*, proactively and voluntarily, by the Current Plan. Put differently, even if the Court ruled in Plaintiffs' favor on every issue, the proper remedy would be to direct the General Assembly to create a new plan that relies on the census data in place of ACS data, which is exactly what has already happened.

## Background

The Illinois Constitution vests the responsibility for redistricting to the General Assembly. Ill. Const. (1970), art. IV, § 3(b) In the event that the General Assembly does not enact an effective redistricting plan by June 30 of the year following the decennial census, the Illinois Constitution provides "a Legislative Redistricting Commission shall be constituted no later than July 10," with the responsibility to agree on a redistricting plan by August 10. Ill. Const. Art. 4 § 3(b).

Although the U. S. Census Bureau traditionally releases the official census data by March 31, in March of 2021, the Census Bureau announced the 2020 census data would be delayed until at least "mid-August."[1] The General Assembly, without

---

[1] https://www.census.gov/newsroom/press-releases/2021/statement-legacy-formatredistricting.html.

access to the final 2020 census data and facing a constitutional mandate to enact a redistricting plan by June 30, enacted a plan using the best data then available: the Census Bureau's ACS data. *See* Ill. P.A. 102-0010, Section 5(d);[2] Defendants Statement of Additional Material Fact ("SOAMF"), ¶¶ 3, 7, 8.

Plaintiffs then immediately filed this lawsuit, alleging that the General Assembly's use of ACS data would have prevented the June Plan from containing constitutional, equipopulous districts; Plaintiffs amended complaint brought identical claims. Dkt. #37 ¶¶ 37-44, 57. On August 12, 2021, the Census Bureau released the official 2020 census data to the states. SOAMF, ¶ 10. And almost immediately thereafter, on August 20, 2021, the General Assembly announced it would reconvene to amend the June Plan to incorporate the now-available 2020 census data. Dkt. #57 at 2. Following multiple committee meetings and nine hearings, the General Assembly passed the Current Plan on August 31, 2021. *See* S.B. 927.[3] Plaintiffs conceded that their malapportionment claims are resolved by the Current Plan. *See* Hr'g Tr. (Sept. 1, 2021) at 17:22-23 ("the malapportionment issues seem to have been addressed.").

---

[2] https://www.ilga.gov/legislation/publicacts/102/PDF/102-0010.pdf
[3]https://www.ilga.gov/legislation/BillStatus.asp?DocNum=927&GAID=16&DocTypeID=SB&LegId=133554&SessionID=110&GA=102
https://www.ilga.gov/legislation/BillStatus.asp?DocNum=927&GAID=16&DocTypeID=SB&LegId=133554&SessionID=110&GA=102. Governor Pritzker has not yet signed S.B. 927; his deadline for doing so is 60 days from when S.B. 927 was delivered to him on September 2, 2021

The Current Plan, therefore, completely resolves Plaintiffs' pleaded claims—that should be the end of the inquiry. Despite this, Plaintiffs have asked the Court to proceed on a dual track that allows them to challenge both the outdated June Plan and the Current Plan at the same time.

In response, this Court ordered briefing on Plaintiffs' Motion, and directed the parties to address: "(a) what event(s) trigger a "remedial phase" in redistricting litigation?; (b) what possible remedies can be fashioned during a remedial phase?; and (c) in the event that a remedy is needed in this case, by what criteria should the panel select one?" Dkt. #94, at 1.

**Argument**

Plaintiffs' Motion argues that House District 5 is 29.9% more populous than the least-populated House district, and that Senate District 3 is 20.3% more populous than the least-populated Senate district. Mot. at 6; SOMF, ¶¶ 35-38. For this reason alone Plaintiffs argue this Court should grant summary judgment and "declare the Enacted Plan and the plan it replaced unconstitutionally malapportioned, enjoin Legislative Defendants and State Board of Elections Defendants from using it in future elections, and establish a schedule for a court-approved plan." Mot. at 13.

This Court should deny Plaintiffs' Motion for summary judgment for the following reasons. *First*, Plaintiffs' challenges to the June Plan are moot because in light of the amended, Current Plan, there are no concerns that "further elections [will be] conducted under the [June] plan. *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). *Second*, Plaintiffs' Motion and SOMF establish not one plaintiff has standing to

5

pursue the claims asserted. *Third*, summary judgment is not available because genuine disputes of material fact still exist regarding whether the June Plan was unconstitutional. And *finally*, even if Plaintiffs had established a viable constitutional claim (which they have not), the only appropriate remedy—for the Court to order the General Assembly to amend the plan to correct any unconstitutional aspects—has already occurred.

## I. Standard on Summary Judgment.

Summary judgment is proper where there is no genuine dispute over any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Gekas v. Vasiliades*, 814 F.3d 890, 896 (7th Cir. 2016) (internal quotation marks omitted). A plaintiff cannot meet this burden by offering mere speculation about what the facts may be. *Houlihan v. City of Chicago*, 871 F.3d 540, 554 (7th Cir. 2017).

## II. Summary Judgment is Inappropriate Because the Challenged June Plan Has Been Amended and Will Not Be Used in any Elections

When and if a redistricting plan is held to be unconstitutional, the primary concern is ensuring a new or amended plan that corrects any unconstitutional aspects, is in place before any upcoming elections. *See, e.g., Reynolds*, 377 U.S. at 585. Plaintiffs' summary judgment should fail for the straightforward reasons that (i) their claims of unconstitutionality based on the use of ACS data and malapportionment have, by Plaintiffs' own admission, been resolved by the amended,

Current Map; and (ii) a successful summary judgment motion and subsequent remedial phase would involve, according to well established precedent and Supreme Court guidance, the General Assembly creating a plan that cures the prior, unconstitutional aspects. Therefore, not only have Plaintiffs received the only proper remedy they could obtain through this process, but the Current Plan eliminates any risk that the June Plan will be used in any future elections.

Plaintiffs' Amended Complaint, and this Motion, are moot in light of Senate Bill 927's passage on August 31, 2021.[4]

### III. Plaintiffs' Lack Standing to Pursue their Claims.

Plaintiffs' Motion and SOMF argues only Senate District 3, and House District 5 are unconstitutionally over-populated. Mot. at 6; SOMF, ¶¶ 35-38. Plaintiffs have not presented evidence, or even alleged, that any Plaintiff lives in these challenged districts. The Motion and SOMF asserts Plaintiffs live in Representative District 60, Representative District 1, Representative District 86, Representative District 6. *See* SOMF ¶¶ 1-5.

"The right to vote is 'individual and personal in nature,' [ ] and that 'voters who allege facts showing disadvantage to *themselves* as individuals have standing to sue' to remedy that disadvantage[.]" *Gill v. Whitford*, 138 S.Ct. 1916, 1929 (2018) (emphasis added) (quoting *Reynolds* v. *Sims,* 377 U. S. 533, 561 (1964) and *Baker v. Carr,* 369 U. S. 186, 206 (1962). The Supreme Court has held that, in the redistricting

---

[4] https://www.ilga.gov/legislation/BillStatus.asp?DocNum=927&GAID=16&DocTypeID=SB&LegId=1 33554&SessionID=110&GA=102

7

context, "a plaintiff seeking relief in federal court must first demonstrate that he has standing to do so," including that he has "a personal stake in the outcome," distinct from a "generally available grievance about government." *Gill*, 138 S.Ct. at 1923 (*citing Baker*, 369 U. S. at 204).

Though it is conceivable Plaintiffs could cure their standing deficiencies through amendment, as this Court recognized, Plaintiffs have declined the opportunity to do so. Worse than the plaintiffs in *Gill* who alleged the necessary personal injury, but "never followed up with the requisite proof," 138 S.Ct. at 1923, Plaintiffs here have not even attempted to make the allegations necessary to confer standing. And there is no dispute that as alleged in that Complaint, no Plaintiff lives in an allegedly malapportioned district. They have not established, therefore, that *their* votes have been diluted, or that they "suffered an injury in fact" to confer standing. *Spokeo, Inc.* v. *Robins*, 136 S. Ct. 1540, 1547 (2016).

Because no Plaintiff has established standing, dismissal of Plaintiffs' First Amended Complaint is merited, as argued in Defendants' concurrently-briefed motion to dismiss. Dkt. #55. Summary judgment should likewise be denied.

## IV. Plaintiffs Have Failed to Establish they Are Entitled to Summary Judgment on their One Person, One Vote Claims

The Amended Complaint's "one person, one vote" claim requires Plaintiffs to show (1) the existence of a population disparity that (2) could have been reduced or eliminated by (3) a good-faith effort to draw districts of equal proportion. *Karcher v. Daggett*, 462 U.S. 725, 730, (1983). A redistricting plan with population disparities over 10% "creates a prima facie case of discrimination and therefore must be

8

justified[.]" *Brown v. Thomson*, 462 U.S. 835, 842-43 (1983). When plaintiffs accomplish this, the burden shifts to the defendants "to prove that the population deviations in its plan were necessary to achieve some legitimate state objective." *Karcher*, 462 U.S. at 740. "Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." *Id.*

The ultimate inquiry, therefore, is often whether the legislature's plan "may reasonably be said to advance [a] rational state policy." *Brown*, 462 U.S. at 843 (quoting *Mahan v. Howell*, 410 U.S. 315, 328 (1973)).

Here, Plaintiffs have presented evidence the June Plan contained population deviations that exceeded the presumptively constitutional limit of 10%. SOMF, ¶¶ 35-38. It is well-established, however, that the inquiry does not end there. If the June Plan were still current, and if Defendants were seeking to defend its use in the upcoming elections, Defendants would be entitled to rebut the presumption created by the June Plan's over-10% population deviations. And on that step in the analysis, a question of fact exists over whether the General Assembly's June Plan "may be reasonably said to advance a rational state policy." *Brown*, 462 U.S. at 843.

Indeed, far from being undisputed in Plaintiffs' favor, the undisputed facts establish that the General Assembly's use of ACS data was "necessary to achieve [a] legitimate state objective[s]." *Karcher*, 462 U.S. at 740. Specifically, Plaintiffs do not dispute that (i) the General Assembly had a constitutional mandate to ensure a plan

9

"became effective" by June 30 (Ill. Const. (1970), art. IV, § 3(b); (ii) the 2020 census data was unavailable to the General Assembly before that constitutional deadline (SOAMF, ¶ 10); and (iii) the ACS data used by the General Assembly was the best-available data at the time the General Assembly had to act (SOAMF, ¶ 3, 7, 8).

In other words, there is no genuine dispute that the General Assembly's reason for passing the June Plan using ACS data was (i) to fulfill its constitutional mandate that it ensure a plan "becomes effective" by June 30; and (ii) with no guarantee of when the official census data would be available, ensuring that an updated redistricting plan would be in place (and tested in the courts) before the 2022 midterm election year. The General Assembly's decision to fulfill its responsibility to the people of Illinois to create a redistricting that would be in place before the upcoming elections both "advanced a rational state policy" and were "necessary to achieve [] legitimate state objective[s]."

To the extent Plaintiffs continue to pursue their claim that the use of ACS data is itself objectionable, that position—far from being undisputed—has been flatly rejected time and again. The Equal Protection Clause does not require legislatures to use the official census data to create redistricting plans, nor has any court ever mandated the use of census data.

The Equal Protection Clause requires that "the seats in both houses of a bicameral state legislature must be apportioned on a population basis." 377 U.S. at 568. Less than two years after *Reynolds*, the Supreme Court expressly declared that "the Equal Protection Clause *does not require the States to use total population figures*

10

*derived from the federal census* as the standard by which this substantial population equivalency is to be measured." *Burns v. Richardson*, 384 U.S. 73, 91 (1966) (emphasis added) (holding that Hawaii could use a registered-voter population base, rather than a census based total population number, in apportioning the State Senate).[5]

More recently, in *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016), the Supreme Court took up the question of whether the Constitution required Texas to use citizen voting age population numbers instead of the state's preferred total population numbers in drawing its districts. The Supreme Court specifically declined to dictate the use of any particular population basis. *Id.* at 1132-22. And this year, a three-judge panel confronted with the question of the release of the census data held a state has the option of using other data for redrawing state legislative districts where the federal decennial census was not taken or was not satisfactory. *Alabama v. United States Dep't of Com.*, 2021 WL 2668810, at *6 fn. 3 (M.D. Ala. June 29, 2021).

In light of this chorus of precedents, any argument by Plaintiffs that the June Plan is unconstitutional based on its use of ACS data clearly fails. At a minimum, there is a question of fact sufficient to defeat summary judgment on whether the use of the ACS data, which creates the claimed deviation, was a rational state policy or necessary to achieve a legitimate state objective such that the June Plan complied

---

[5] *Burns'* express authorization of data other than the decennial census data has been echoed for decades by other federal courts, including the Seventh Circuit. *See Tucker v. U.S. Dep't of Com.*, 958 F.2d 1411, 1418 (7th Cir. 1992) ("states are not required to use census figures for the apportionment of their legislatures")).

11

with the Equal Protection Clause. To the extent the Court finds the First Amended Complaint and/or the June Plan remain relevant, summary judgment should be denied on this basis alone.

## I. Plaintiffs request for a Remedial Phase is Unnecessary and Improper

1. *What triggers a remedial phase?* A remedial phase is appropriate only if there is a valid claim that could support a finding of a constitutional violation—namely here, that the June Plan was unconstitutional. The Supreme Court has clearly stated, "Federal courts are barred from intervening in state apportionment in the absence of a violation of federal law precisely because it is the domain of the States, and not the federal courts, to conduct apportionment in the first place." *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993).

2. *What possible remedies can be fashioned during a remedial phase?* When federal courts intervene in redistricting, the paramount principle is to correct the constitutional violation, with the aim "that no further elections are conducted under the invalid plan." *Reynolds*, 377 U.S. at 585. In redistricting litigation, the remedy will therefore almost always involve the creation of a new plan that cures the unconstitutional aspects of the current plan. The Supreme Court has long held that such amendments or redrawing should be left to the state legislatures, in the first instance. *Wise v. Lipscomb*, 437 U.S. 535, 539-40 (1978) ("redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt"); *Chapman* v. *Meier*, 420 U.S. 1, 27 (1975); *Gaffney* v. *Cummings*, 412 U.S. 735, 749 (1973); *Burns* v. *Richardson*, 384

U.S. 73, 84-85 (1966) ("When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan."). In other words, when legislative action can remedy an unconstitutional plan, the redistricting should be left to the elected legislature which is vested with that responsibility. *See Perry v. Perez*, 132 S.Ct. 934, 941 (2012).

3. *To the extent a remedy is necessary, how should the Court chose one?* Only if the June Plan were held to be unconstitutional, the Court would have discretion to initiate a remedial phase. The purpose of such a phase would be to remedy the unconstitutional aspects of the June Plan. As the cases above demonstrate (and many more like them), the proper remedy would unquestionably be to direct the Illinois General Assembly to amend the June Plan to cure its unconstitutional aspects. That was the remedy ordered by the three-judge panel in *Baldus v. Members of the Wisconsin Government Accountability Board*, in which two assembly districts the Wisconsin legislature's plan were held to violate the Voting Rights Act. 849 F. Supp. 2d 840, 859 (E.D. Wis. 2012).

Relying on *Perry v. Perez*, the court held that "[h]eeding the instruction of the United States Supreme Court that '[r]edistricting is primarily the duty and responsibility of the State,' the Court will not tread into the black water of re-drawing the redistricting boundaries itself. Instead, as discussed above, the Court will allow

13

the Legislature to sort out the redistricting maps' infirmities on its own." *Id*. at 861 (internal citation to *Perry* omitted).[6]

* * *

*If* the Court proceeds to adjudicate the constitutionality of the June Plan, *if* the Court finds the June Plan to have been unconstitutional, and *if* the Court then exercises its discretion to initiate a remedial phase, the proper remedy would be to order the duly-elected Illinois General Assembly to amend the June Plan to cure its unconstitutional aspects. When placed in this context, the absurdity of Plaintiffs' request only becomes more clear. That is because even if everything went Plaintiffs' way, the proper remedy would land us right where we are: with the amended, Current Plan which resolves Plaintiffs' claims by relying on the census data in place of ACS data, and curing the prior, alleged malapportionment issues. The Court should exercise its discretion and hold that engaging in this long and resource-intensive process on an outdated plan is unnecessary and entirely inappropriate where, as here, Defendants have already proactively and voluntarily provided the requested relief.

## Conclusion

WHEREFORE, for the reasons stated, Defendants respectfully request this Court deny Plaintiffs' Motion for Summary Judgment.

---

[6] In *Baldus*, the state senate ultimately deadlocked on the amended plan, necessitating further remedies. The court invited the parties and nonparties to file proposed plans—limited to the challenged districts. *Baldus v. Members of the Wis. Gov'y Accountability Bd*, 849 F. Supp. 2d 862, 863 (E.D. Wis. 2012). After choosing the plan that it felt best complied with the Voting Rights Act, the court ordered those two redrawn districts be incorporated into the existing plan, and affirmed the remainder of the existing plan. *Id*.

14

Dated: <u>September 10, 2021</u>    Respectfully submitted,

<u>/s/Adam R. Vaught</u>

| | |
|---|---|
| Michael J. Kasper<br>151 N. Franklin Street<br>Suite 2500<br>Chicago, IL 60606<br>(312) 704-3292<br>mjkasper@60@mac.com<br>*Counsel for Defendants Welch, Office of the Speaker, Harmon, and Office of the President* | Adam R. Vaught<br>Hinshaw & Culbertson LLP<br>151 North Franklin Street, Suite 2500<br>Chicago, IL 60606<br>(312) 704-3000<br>avaught@hinshawlaw.com<br>*Counsel for Defendants Welch, Office of the Speaker, Harmon, and Office of the President* |
| Devon C. Bruce<br>Power Rogers, LLP<br>70 W. Madison St., Suite 5500<br>Chicago IL, 60606<br>(312) 236-9381<br>dbruce@powerrogers.com<br>*Counsel for Defendants Welch, Office of the Speaker, Harmon, and Office of the President* | Heather Wier Vaught<br>Heather Wier Vaught, P.C.<br>106 W. Calendar Ave, #141<br>LaGrange, IL 60625<br>(815) 762-2629<br>heather@wiervaught.com<br>*Counsel for Defendants Welch, Office of the Speaker, Harmon, and Office of the President* |
| Sean Berkowitz<br>Colleen C. Smith<br>Latham & Watkins<br>330 N. Wabash, Suite 2800<br>Chicago, IL 60611<br>(312) 777-7016<br>sean.berkowitz@lw.com<br>*Counsel for Defendants Harmon, and Office of the President* | |

**CERTIFICATE OF SERVICE**

15

      I hereby certify that on September 10, 2021, I electronically filed the above Defendants Welch, Office of the Speaker, Harmon, Office of the President of the Illinois Senate's Opposition to Plaintiffs' Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

      By: */s/Adam R. Vaught*

1042768\309063133.v2