## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JULIE CONTRERAS, IRVIN FUENTES, ABRAHAM MARTINEZ, IRENE PADILLA, ROSE TORRES, LAURA MURPHY, CRISTINA FLORES, JOSE ALCALA, TROY HERNANDEZ, GABRIEL PEREZ, IVAN MEDINA, ALFREDO CALIXTO, HISPANIC LAWYERS ASSOCIATION OF ILLINOIS, and PUERTO RICAN BAR ASSOCIATION OF ILLINOIS<br><br>                        Plaintiffs,<br><br>v.<br><br>ILLINOIS STATE BOARD OF ELECTIONS, IAN K. LINNABARY, WILLIAM J. CADIGAN, LAURA K. DONAHUE, WILLIAM M. MCGUFFAGE, KATHERINE S. MCCRORY, RICK S. TERVEN, SR. and CASANDRA B. WATSON in their official capacities as members of the Illinois State Board of Elections, DON HARMON, in his official capacity as President of the Illinois Senate, and THE OFFICE OF THE PRESIDENT OF THE ILLINOIS SENATE, EMANUEL CHRISTOPHER WELCH, in his official capacity as Speaker of the Illinois House of Representatives, and the OFFICE OF THE SPEAKER OF THE ILLINOIS HOUSE OF REPRESENTATIVES,<br><br>                        Defendants. | Case No. 1:21-cv-3139 |

## PLAINTIFFS' SECOND AMENDED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      This action, which is brought under the United States Constitution and the Voting

Rights Act of 1965 ("VRA"), 52 U.S.C. § 10101 *et seq*,. seeks declaratory and injunctive relief

against the Illinois state government officials ("Defendants") who are charged with overseeing

and conducting elections for state legislative seats and/or redrawing state legislative district

boundaries after each decennial census.  Ill. Const. art. III, § 5; Ill. Const. art. IV, § 3.

### The SB 927 Plans

2.      Plaintiffs seek a declaratory judgment that the legislative redistricting plans

created in Senate Bill 927 ("SB 927 plans"), which were passed on August 31, 2021 and signed

by the governor on September 24, 2021, violate Section 2 of the VRA and the Fourteenth

Amendment to the United States Constitution because the plans have the effect of diluting the

Latino vote and were drawn using race as a predominant factor.  Plaintiffs seek permanent and

preliminary injunctive relief, prohibiting the calling, holding, or certifying of any future elections

using the SB 927 plans.  Plaintiffs further seek the creation of a districting plan that complies

with Section 2 and the Fourteenth Amendment and that provides adequate representation for

Latinos in Illinois.

### The June 2021 Plans

3.      Plaintiffs seek a declaratory judgment that the legislative redistricting plans

created based almost entirely on American Community Survey ("ACS") population estimates for

election of representatives and senators to the Illinois General Assembly, which were passed on

May 28, 2021 and signed by Illinois Governor J.B. Pritzker on June 4, 2021 ("June 2021 Plans"),

are malapportioned in violation of the Fourteenth Amendment to the United States Constitution.

Plaintiffs seek preliminary and permanent injunctions prohibiting the calling, holding, or

certifying of any future election using the June 2021 Plans.  Plaintiffs further seek the creation of

a districting plan that is equally apportioned as measured by the 2020 Census redistricting data

contained in Public Law 94-171 ("P.L. 94-171") file issued by the U.S. Census Bureau (the

"Bureau").

4.     The General Assembly used data from the ACS five-year estimates for 2015-2019 and "other election data" to draw the boundaries for the districts used to elect members of the General Assembly.

5.     The June 2021 Plans purportedly ensure compliance with the "one-person, one-vote" standard mandated by the Fourteenth Amendment; however, ACS data is inadequate for that purpose, and accordingly, the June 2021 Plans are malapportioned.  Absent judicial intervention, the June 2021 Plans may be used in the 2022 general election for the General Assembly, resulting in the vote dilution of Plaintiffs and others who live in overpopulated districts.

6.     Under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, state legislative districts are required to be of substantially equal population. This requirement is encompassed in the "one-person, one-vote" standard.  Under this standard, states must create legislative districts that are substantially equal in population, and the states are responsible for regularly reapportioning these districts to ensure constitutional compliance.

7.     Plaintiffs seek a declaratory judgment that the June 2021 Plans violate the Fourteenth Amendment to the United States Constitution and an order enjoining the implementation of the June 2021 Plans.

## II.     JURISDICTION AND VENUE

8.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' malapportionment claim, which arises under the laws of the Constitution of the United States.  This Court has original jurisdiction over Plaintiffs' request for declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 for causes of action arising under the Fourteenth Amendment to the United States Constitution and the VRA, 52 U.S.C. § 10101.  Jurisdiction for

Plaintiffs' claims under the Fourteenth Amendment to the U.S. Constitution is based upon 42 U.S.C. § 1983 and 28 U.S.C. § 1331.  Jurisdiction for Plaintiffs' claim for attorney's fees is based on 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988(b).

9.      Venue is proper in this district under 28 U.S.C. § 1391(b) because all Defendants reside in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

10.      This action challenges the constitutionality of the apportionment of the General Assembly.  Accordingly, "[a] district court of three judges shall be convened. . . ."  28 U.S.C. § 2284(a).

### III.      PARTIES

11.      Plaintiff Julie Contreras is a registered voter of Latina heritage residing within House District 60 and Senate District 30 under the June 2021 and SB 927 plans.[1]  In the June 2021 Plans, House District 60 is overpopulated by 0.1%, and Senate District 30 is Overpopulated by 2.1%.  Plaintiff Contreras is injured by residing in districts that are unconstitutionally malapportioned in the June 2021 Plans.

12.      Plaintiff Irvin Fuentes is a registered voter of Latino heritage residing within House District 1 and Senate District 1 under the June 2021 and SB 927plans.  In the June 2021 Plans, House District 1 is overpopulated by 4.3%, and Senate District 1 is overpopulated by 3.7%.  Plaintiff Fuentes is injured by residing in districts that are unconstitutionally malapportioned in the June 2021 Plans.

---

[1] Plaintiffs use the terms "House District" and "Representative District" interchangeably in this complaint to indicate districts that elect representatives to the lower chamber of the Illinois General Assembly.  Upon information and belief, Defendants use these terms interchangeably.

13.     Plaintiff Abraham Martinez is a registered voter of Latino heritage residing within House District 86 and Senate District 43 under the June 2021 and SB 927 Plans.

14.     Plaintiff Irene Padilla is a registered voter of Latina heritage residing within House District 6 and Senate District 3 under the June 2021 and SB 927 plans.  In the June 2021 Plans, House District 6 is Overpopulated by 9.6%, and Senate District 3 is Overpopulated by 12.3%.  Plaintiff Padilla is injured by residing in districts that are unconstitutionally malapportioned in the June 2021 Plans.

15.     Plaintiff Rose Torres is a registered voter of Latina heritage residing within House District 24 and Senate District 12 under the June 2021 and SB 927 plans.  The SB 927 Plans configure the adopted House District in which she resides so as to dilute the Latino vote and deprive her of a meaningful opportunity to participate in the political process and election of representatives from that district.

16.     Plaintiff Cristina Flores is a registered voter of Latina heritage residing within House District 3 and Senate District 2 under the June 2021 and SB 927 plans.  The SB 927 Plans configure the adopted House District and Senate District in which Plaintiff Flores resides so as to dilute the Latino vote and deprive her of a meaningful opportunity to participate in the political process and election of representatives from those districts.

17.     Plaintiff Gabriel Perez is a registered voter of Latino heritage residing in House District 24 and Senate District 12 under the SB 927 plans.  The SB 927 Plans configure the adopted House District in which Plaintiff Perez resides so as to dilute the Latino vote and deprive him of a meaningful opportunity to participate in the political process and election of representatives from that district.

18.     Plaintiff Jose Alcala is a registered voter of Latino heritage residing in House District 21 and Senate District 11 under the SB 927 Plans.  The SB 927 Plans configure the adopted House District and Senate District in which Plaintiff Alcala resides so as to dilute the Latino vote and deprive him of a meaningful opportunity to participate in the political process and election of representatives from those districts.  Plaintiff Alcala is further injured by the race-based redistricting of adopted House District 21 and Senate District 11 in the SB 927 Plans.

19.     Plaintiff Laura Murphy is a registered voter of Latina heritage residing in House District 3 and Senate District 2 under the SB 927 Plans.  The SB 927 Plans configure the adopted House District and Senate District in which Plaintiff Murphy resides so as to dilute the Latino vote and deprive her of a meaningful opportunity to participate in the political process and election of representatives from those districts.

20.     Plaintiff Ivan Medina is a registered voter of Latino heritage residing in House District 39 and Senate District 20 under the SB 927 Plans.  The SB 927 Plans configure the adopted House District in which Plaintiff Medina resides so as to dilute the Latino vote and deprive him of a meaningful opportunity to participate in the political process and election of representatives from that district.

21.     Plaintiff Troy Hernandez is a registered voter of Latino heritage residing in House District 24 and Senate District 12 under the SB 927 Plans.  The SB 927 Plans configure the adopted House District in which Plaintiff Hernandez resides so as to dilute the Latino vote and deprive him of a meaningful opportunity to participate in the political process and election of representatives from that district.

22.     Plaintiff Alfredo Calixto is a registered voter of Latino heritage residing in House District 39 and Senate District 20 under the SB 927 Plans.  The SB 927 Plans configure the

adopted House District in which Plaintiff Calixto resides so as to dilute the Latino vote and deprive him of a meaningful opportunity to participate in the political process and election of representatives from that district.

23. Plaintiff Maria Gneich is a registered voter of Latina heritage residing in House District 22 and Senate District 11 under the SB 927 Plans. The SB 927 Plans configure the adopted Senate District in which Plaintiff Gneich resides so as to dilute the Latino vote and deprive her of a meaningful opportunity to participate in the political process and election of representatives from that district. Plaintiff Gneich is further injured by the race-based redistricting of adopted Senate District 11 in the SB 927 Plans.

24. Plaintiff Puerto Rican Bar Association of Illinois ("PRBA") is a professional association of Latino lawyers with members throughout Illinois. Plaintiff PRBA is a multipurpose organization, and its goals include influencing legislation and policies relevant to the common interests of Latino lawyers in the State of Illinois; advocating for diversity in the judiciary, the legal profession, and the legislature; ensuring that elections are conducted securely and fairly; and promoting civic education and political participation in the Latino community. Individual members of Plaintiff PRBA include Latino registered voters of Illinois who reside in SB 927 adopted voting districts that have the effect of diluting their voting strength, and SB 927 adopted voting districts where Defendants have used race as a predominant factor in determining the districts' boundaries.

25. Plaintiff Hispanic Lawyers Association of Illinois (HLAI) is a professional association of Latino lawyers with members throughout Illinois. Plaintiff HLAI is a multipurpose organization and its goals include promoting the common interests of Latino lawyers in Illinois, ensuring that elections are conducted securely and fairly; empowering of the

Hispanic community through the support of its community organizations; and promoting legal education and civil rights among Hispanic attorneys and the community. Individual members of Plaintiff HLAI include Latino registered voters of Illinois who reside in SB 927 adopted voting districts that have the effect of diluting their voting strength, and SB 927 adopted voting districts where Defendants have used race as a predominant factor in determining the districts' boundaries.

26.     All individual Plaintiffs and members of Plaintiffs PRBA and HLAI are injured by residing in districts in plans—the June 2021 Plans—that are unconstitutionally malapportioned because of Defendants' failure to use a population basis to apportion districts.

27.     Defendant Illinois State Board of Elections ("the Board") supervises the administration of registration and election laws throughout Illinois under Article III, Section 5 of the Illinois Constitution and 10 ILCS 5/1A-1, *et seq*., ensuring that elections in Illinois are conducted in accordance with all applicable laws. The Board will supervise the administration of the 2022 general election for the Illinois Senate and Illinois House of Representatives.

28.     Defendant Catherine S. McCrory is a member of the Illinois State Board of Elections and is sued in her official capacity. In this capacity, Ms. McCrory supervises the administration of registration and election laws throughout Illinois. Ms. McCrory will supervise the administration of the 2022 general election.

29.     Defendant Rick S. Terven, Sr. is a member of the Illinois State Board of Elections and is sued in his official capacity. In this capacity, Mr. Terven supervises the administration of registration and election laws throughout Illinois. Mr. Terven will supervise the administration of the 2022 general election.

30.     Defendant Ian K. Linnabary is the Chair of the Illinois State Board of Elections and is sued in his official capacity. In this capacity, Mr. Linnabary supervises the administration of registration and election laws throughout Illinois. Mr. Linnabary will supervise the administration of the 2022 general election.

31.     Defendant Casandra B. Watson is the vice chair of the Illinois State Board of Elections and is sued in her official capacity. In this capacity, Ms. Watson supervises the administration of registration and election laws throughout Illinois. Ms. Watson will supervise the administration of the 2022 general election.

32.     Defendant William J. Cadigan is a member of the Illinois State Board of Elections and is sued in his official capacity. In this capacity, Mr. Cadigan supervises the administration of registration and election laws throughout Illinois. Mr. Cadigan will supervise the administration of the 2022 general election.

33.     Defendant Laura K. Donahue is a member of the Illinois State Board of Elections and is sued in her official capacity. In this capacity, Ms. Donahue supervises the administration of registration and election laws throughout Illinois. Ms. Donahue will supervise the administration of the 2022 general election.

34.     Defendant William M. McGuffage is a member of the Illinois State Board of Elections and is sued in his official capacity. In this capacity, Mr. McGuffage supervises the administration of registration and election laws throughout Illinois. Mr. McGuffage will supervise the administration of the 2022 general election.

35.     Defendant Don Harmon is a member of the General Assembly and is sued in his official capacity as President of the Illinois Senate.

36.     Defendant the Office of the President of the Illinois Senate is the office of the presiding officer of the Illinois Senate, as designated by Article IV, Section 6(b) of the Illinois Constitution.

37.     Defendant Emanuel Christopher Welch is a member of the General Assembly and is sued in his official capacity as Speaker of the Illinois House of Representatives.

38.     Defendant the Office of the Speaker of the Illinois House of Representatives is the office of the presiding officer of the Illinois House of Representatives, as designated by Article IV, Section 6(b) of the Illinois Constitution.

39.     Defendants Don Harmon, the Office of the President of the Illinois Senate, Emanuel Welch, and the Office of the Speaker of the Illinois House of Representatives ("Legislative Defendants") presided over the Illinois General Assembly in the redistricting process that resulted in the passage of redistricting plans in June 2021 and August 2021.

40.     During all times mentioned in this complaint, Defendants xand their agents were acting under color of law:  under color of the state constitution, statutes, laws, rules, regulations, customs, and usages of the State of Illinois, the Illinois General Assembly, and the Illinois State Board of Elections.

### IV. FACTS
#### The 2021 Redistricting Process in Illinois

41.     The Illinois Constitution provides dates for the 2021 redistricting cycle.  ILL. CONST. art. IV, § 3(b).  If a new legislative redistricting map is not passed by the General Assembly and signed into law by the governor before June 30 in the year following the decennial census, the task of redistricting falls to a Legislative Redistricting Commission (the "Redistricting Commission") to be created on or before July 10.  *Id.*  If the Redistricting Commission fails to file a plan on or before August 10, the Supreme Court must submit the

names of two persons, not of the same political party, to the Secretary of State on or before September 1. *Id.*

42.     On or before September 5, the Secretary of State must publicly and randomly choose the name of one of the two persons nominated by the Illinois Supreme Court to serve as the ninth member of the Redistricting Commission.  ILL. CONST. art. IV, § 3(b).  On or before October 5, the newly constituted commission must file a redistricting plan with the Secretary of State.  A plan so chosen will have the force and effect of law.  *Id.*

43.     On March 17, 2021, the General Assembly began holding virtual hearings to solicit public feedback on the redistricting process in Illinois.

44.     On May 21, 2021, the General Assembly proposed draft representative and legislative redistricting maps.  On May 25, 2021, and May 26, 2021, the Illinois House and Senate held virtual hearings to solicit feedback on the proposed redistricting maps.

45.     On May 27, 2021, House and Senate Democrats issued a press release announcing the release of updated maps.  For the first time, the General Assembly explained that the maps were generated using five-year ACS data and "other election data."  However, there was no explanation of how the General Assembly used ACS estimates and "other election data" to populate representative and legislative districts.  There was also no disclosure of either the estimated populations of the various representative and legislative districts or demographic breakdowns of these districts.

46.     Early on May 28, 2021, with only one hour's notice, House and Senate Democrats scheduled hearings to allow public comment on the updated maps.  Constituents and community advocacy organizations complained about the lack of notice and protested the fact that the General Assembly had neither given the public the underlying methodology used to populate

representative and legislative districts nor provided them with time to analyze the underlying data and methodology used to create the maps.

47.     Late that evening, the General Assembly passed House Bill 2777 and Senate Floor Amendment 1 and sent the June 2021 Plans to Governor Pritzker for approval.

48.     The June 2021 Plans measure total population using five-year ACS estimated data — not P.L. 94-171 actual enumeration data.  The current redistricting plans are therefore not in compliance with the Fourteenth Amendment's one-person, one-vote mandate.

49.     On June 4, 2021, the governor signed House Bill 2777.

50.     On August 12, 2021, the Census Bureau released P.L. 94-171 data in legacy format.  The legacy-format data confirmed that the June 2021 Plans are malapportioned beyond tolerable limits, with a maximum deviation for the House of 20.3% and a maximum deviation for the Senate of 29.9%.

## P.L. 94-171 Redistricting Data

51.     The United States Constitution requires an "actual Enumeration" of every person living in the United States to take place every ten years.  U.S. CONST. art. I, § 2.

52.     The decennial count of the national population is used to allocate seats in the United States House of Representatives to states based on the "whole number of persons in each State."  U.S. CONST. amend. XIV, § 2.

53.     P.L. 94-171, enacted in 1975, "directs the Census Bureau to make special preparations to provide redistricting data needed by the fifty states.  Within a year following Census Day, the Census Bureau must send the data agreed upon to redraw districts for the state legislature to each state's governor and majority and minority legislative leaders."  The P.L. 94-

171 redistricting data provides the decennial count data by small area geography and includes tabulations by major racial/ethnic groups.

54.     Following the release of the P.L. 94-171 redistricting data, states use the data to draw district lines that comply with the one-person, one-vote standard.

55.     In order to comply with the one-person, one-vote standard, the General Assembly's representative and legislative districts must be "substantially equal in population." Historically and traditionally, P.L. 94-171 data has been used for purposes of determining whether representative and legislative districts are in compliance with the one-person, one-vote standard.

56.     However, on April 13, 2020, the Bureau announced a new Census timeline that accounted for delays created by the COVID-19 pandemic (the "COVID-19 Plan"), among other reasons.  The new timeline included postponed dates for collecting and processing data.

57.     On February 12, 2021, because of these delayed processing dates, the Bureau announced that "it will deliver the Public Law 94-171 redistricting data to all states by Sept. 30, 2021.  COVID-19-related delays and prioritizing the delivery of the apportionment results delayed the Census Bureau's original plan to deliver the redistricting data to the states by March 31, 2021."  Press Release, U.S. Census Bureau, Census Bureau Statement on Redistricting Timeline (Feb. 12, 2021) (available at https://www.census.gov/newsroom/press-releases/2021/statement-redistricting-data-timeline.html) (last visited June 10, 2021).

58.     Although the Bureau did not plan to release redistricting data in final form until September 30, 2021, "[s]tates, as well as the public, [were scheduled to receive] the data they need to begin redistricting by August 16." U.S. Census Bureau, 2020 Census Updates (June 8,

2021) (available at https://www.census.gov/programs-surveys/decennial-census/decade/2020/2020-census-main.html) (last visited June 10, 2021).

**The Inadequacy of ACS Estimates for Redistricting Purposes**

**Population Estimates vs. Enumeration**

59.     P.L. 94-171 data and ACS estimates have different purposes and different collection methodologies.  P.L. 94-171 data is based on the decennial census's actual enumeration of the population.  The ACS is an ongoing, yearly, sample survey by the Bureau that collects detailed demographic information including ancestry, citizenship, educational attainment, income, language proficiency, migration, disability, employment, and housing characteristics from approximately 2.5 percent of U.S. households.  ACS data are an estimate of population characteristics based on sample data, and not a count of U.S. citizens and non-U.S. citizens.

60.     ACS data are not used to determine whether voting districts are equipopulous and comply with the one-person, one-vote constitutional requirement.  Rather, "in the overwhelming majority of cases, jurisdictions have equalized total population, as measured by the decennial census" total population enumeration.  *Evenwel v. Abbott*, 136 S. Ct. 1120, 1125 (2016).

61.     ACS data are not available for census blocks, the smallest geographical units used in redistricting.  Rather, ACS estimates are available only at the "block group" level.  Block groups typically contain between 600 and 3,000 people.[2]  Although the ACS is designed to provide reliable estimates using one year of data for areas with populations over 65,000, which includes all states and many counties, multiple years of data must be aggregated in order to

---

[2] *See* United States Census Bureau, Glossary, https://www.census.gov/programs-surveys/geography/about/glossary.html [https://perma.cc/A8JT-Y8Z8 ] (last visited on May 6, 2021).

obtain data for smaller areas, such as block groups. The ACS does not produce data for census blocks because the populations in question are too small to estimate accurately. Only an enumeration can measure the population of census blocks.

### Timeliness

62. ACS data are released in one-year and five-year estimates. One-year estimates are available for populations of at least 65,000. The Bureau combines five consecutive years of ACS data to produce multiyear estimates for geographic areas with fewer than 65,000 residents.

63. Because one-year estimates are not suitable for populations under 65,000, redistricting maps drawn with ACS data, such as the June 2021 Plans, require the use of five-year estimates.

64. Five-year ACS estimates are not current for purposes of determining whether districts comply with the one-person, one-vote standard. Eighty percent of the data from the 2015-2019 ACS five-year survey was between two and five years old by Census Day, April 1, 2020.

65. P.L. 94-171 actual enumeration data captures a snapshot in time (i.e., the population on April 1, 2020).

### SB 927 Plans

66. Section 2 of the VRA, 52 U.S.C. § 10301(a), applies nationwide and prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" A violation of Section 2 is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to

elect representatives of their choice." § 10301(b). Section 2 is a permanent provision of the VRA.

67.     On August 26, 2021, the General Assembly began holding hearings to solicit community feedback on a new districting plan. It released the SB 927 plans to the public on August 30, 2021, scheduling and holding a hearing to solicit community feedback on the SB 927 plans on the same day.

68.     On August 31, 2021 the General Assembly passed the SB 927 plans, and the governor signed SB 927 on September 24, 2021.

69.     The SB 927 redistricting scheme for electing members of the General Assembly violates Section 2 because it dilutes the voting strength of Latino voters in Illinois and denies them an equal opportunity to participate in the political process.

70.     In the adoption of SB 927, Defendants engaged in intentional racial gerrymandering in violation of the United States Constitution and Section 2 of the VRA. Defendants purposefully excluded Latino residents from certain districts based on race as a predominant factor, absent a compelling state interest.

71.     Between 2010 and 2020 the Latino population in Illinois experienced extraordinary growth. Although the state's overall population decreased slightly, the number of Latinos in Illinois increased from 2,027,578 to 2,337,410, an increase of 309,832 persons. As a result, Latinos grew as a share of Illinois' total population, increasing from 15.8% of the total population in 2010 to 18.2% in 2020.

72.     Similarly, the Latino citizen voting age population ("LCVAP") in Illinois increased significantly from 698,445 to 1,015,250, an increase of 316,805 persons. As a

percentage of Illinois' total citizen voting age population ("CVAP"), Latinos grew from approximately 8% of CVAP to 11.2%.

73. Given the growth of the Latino population of Illinois in both absolute and relative terms, the growth of the LCVAP both in absolute and relative terms, the geographic concentration of the Latino population, and the overall decrease in Illinois' total population, one might have expected Defendants and the General Assembly to have created a districting plan that reflects the growth and increasing political importance of the Latino community by creating more Latino opportunity districts (districts that contain at least 50% LCVAP and afford a geographically compact Latino population an equal opportunity to elect a candidate of choice). That is not what happened.

74. The General Assembly did not merely fail to create more Latino opportunity districts, it created fewer of them. In the Illinois Senate, the number of Latino opportunity districts decreased from three in the General Assembly's 2011 redistricting plan ("Benchmark Plan") to two in the SB 927 Plan, and, in the Illinois House, the number of Latino opportunity districts decreased from five in the Benchmark Plan to four in the SB 927 Plan. If elections are held under the SB 927 redistricting plans, approximately 3.4% of Illinois House and Senate districts will be Latino opportunity districts. This percentage does not compare favorably with the Latino community's share of Illinois' CVAP, approximately 11.21%. This disparity is relevant to whether—and tends to suggest that—the SB 927 redistricting plans violate Section 2 of the VRA.

75. The Latino population of Illinois is sufficiently geographically compact to comprise the majority of citizen voting age persons in nine house districts and four senate districts.

**House District 3**

76.     Legislative Defendants dismantled an existing Latino opportunity district, House District 3, in the Benchmark Plan.  Under the Benchmark Plan, House District 3 contained 58.7% Latino citizen voting age population.

77.     Under the SB 927 plans, House District 3 contains 48.1 % LCVAP.  The Defendants and the General Assembly moved district 3's boundaries north to exclude heavily Latino areas just south of the district.  Defendants' failure to include even a small part of the heavily Latino neighborhoods just south of the district, without substantially changing District 3's boundaries, had the effect of depriving Latino voters of a Latino opportunity district.

**House District 4**

78.     A Latino opportunity district could have been created near House District 4.

79.     Under the SB 927 plans, House District 4 contains 45.4% LCVAP.

80.     Defendants failed to create a LCVAP-majority district when they could have added areas near House District 4 to create a Latino citizen voting age population-majority district, depriving Latino voters of an equal opportunity to elect representatives in House District 4.

**House District 21**

81.     A Latino opportunity district could have been created near House District 21 in the SB 927 Plan.  House District 21, formerly House District 23 in the Benchmark Plan, was renumbered in the SB 927 Plan.  Under the Benchmark Plan, former House District 23 contained 44.5% LCVAP.

82.     Under the SB 927 Plan, House District 21 contains 42.9% LCVAP. Including larger parts of Berwyn and Cicero in the northern part of the district would create a Latino

opportunity district. Defendants' failure to do so had the effect of depriving Latino voters of an equal opportunity to elect representatives of choice.

83. By moving Latinos into other districts and out of House District 21, SB 927 uses race as a predominant factor to allocate Latino voters into and out of House District 21.

**House District 24**

84. A Latino opportunity district could have been created near House District 24 in the SB 927 Plan. House District 24, formerly House District 2 in the Benchmark Plan, was renumbered in the SB 927 Plan. Under the Benchmark Plan, former House District 2 contained 42.6% LCVAP.

85. Under the SB 927 Plan, Defendants and the General Assembly removed large portions of McKinley Park and Back of the Yards from House District 24. Under SB 927, House District 24 contains a LCVAP of 43.9%. Retaining and expanding these areas, would have created a Latino opportunity district. Defendants' failure to do so had the effect of depriving Latino voters of an equal opportunity to elect representatives of choice.

**House District 39**

86. A Latino opportunity district could have been created near House District 39.

87. Under the SB 927 Plan, House District 39 contains a LCVAP of 45.3%.

88. Defendants failed to create a LCVAP-majority district when they could have added areas near House District 39 to create a Latino citizen voting age population-majority district. Defendants' failure to do so had the effect of depriving Latino voters of an equal opportunity to elect representatives of choice.

**Senate District 2**

89.     A Latino opportunity district could have been created near Senate District 2.

Under the SB 927 plans, District 2 has a LCVAP 46.8%.

90.     By making House Districts 3 and 4, which are nested within Senate District 2,

into Latino citizen voting age population-majority house districts, Defendants could have made

Senate District 2 into a Latino CVAP-majority district. Defendants' failure to do so had the

effect of depriving Latino voters of an equal opportunity to elect representatives of choice.

**Senate District 11**

91.     Legislative Defendants dismantled a Latino opportunity district near Senate

District 11 in the SB 927 Plan.  Senate District 11, formerly Senate District 12 in the Benchmark

Plan, was renumbered in the SB 927 Plan.  Under the Benchmark Plan, former Senate District 12

contained 54.7% LCVAP.

92.     The incumbent in Senate District 11, formerly Senate District 12, is Senator

Steven M. Landek, a White non-Latino Democrat.

93.     Under the Benchmark Plan, former House Districts 23 and 24 were nested within

Mr. Landek's former Senate District 12.  Former House District 23 contained 44.5% LCVAP,

and former House District 24 contained 66.3% LCVAP.

94.     Under the SB 927 Plan, House Districts 21 (formerly 23 in the Benchmark) and

House District 22 are nested within Mr. Landek's current Senate District 11.  House District 21

(formerly 23) contains 42.9% LCVAP, and House District 22 contains 52.7% LCVAP.

95.     Legislative Defendants changed the nested house district composition of Senate

District 11 in SB 927 from the Benchmark nesting in a manner that replaced a house district (24)

with more than 60% LCVAP with one that had just above 50% LCVAP (22).  Additionally,

Legislative Defendants not only failed to raise LCVAP in House District 21 (formerly 23) in the SB 927 Plan from the Benchmark Plan, but also lowered the percentage of Latino citizen voting age population in that district.

96.     By re-nesting the house districts that comprise Senator Landek's district and lowering the LCVAP of House District 21, Legislative Defendants used race as a predominate factor to protect a White non-Latino incumbent Democrat.

97.     By moving Latinos into other districts and out of Senate District 11, SB 927 uses race as a predominant factor to allocate Latino voters into and out of Senate District 11. SB 927 thereby discriminates against voters on the basis of race in Senate District 11 in violation of the Fourteenth Amendment to the United States Constitution.

98.     Defendants' dismantling of Senate District 11 had the effect of depriving Latino voters of an equal opportunity to elect representatives of choice.

**Racially Polarized Voting**

99.     Elections to the General Assembly, including district elections in the areas in and around House Districts 3, 4, 21, 24, and 39, and Senate Districts 2 and 11, are characterized by racially polarized voting.

100.     Latino voters in Illinois, including those in and around House Districts 3, 4, 21, 24, and 39, and Senate Districts 2 and 11, are politically cohesive.

101.     Non-Latino voters, including those in and around House Districts 3, 4, 21, 24, and 39, and Senate Districts 2 and 11, vote sufficiently as a bloc to enable them—in the absence of special circumstances, such as the Latino candidate running unopposed—to defeat the Latino voters' preferred candidates in Illinois, including the areas in which LCVAP-majority districts can be created.

## History and Effects of Discrimination

102.     The State of Illinois has a long history of discriminating against and disenfranchising qualified Latino voters.

103.     Latinos in Illinois have been subject to widespread official and unofficial discrimination for many years, affecting their ability to participate in the political process.

104.     Latinos in Illinois continue to bear the effects of discrimination in such areas as education, employment, housing, and health, which depresses their socioeconomic status and hinders their participation in the political process.

105.     The SB 927 Plans interact with social and historical conditions to cause an inequality in the opportunity of Latino voters to elect representatives of choice as compared to White non-Latino voters.

106.     Unless the relief requested in this cause is granted, Plaintiffs will suffer denial of equal rights and protection, and a dilution of their statutorily protected right to vote.  Plaintiffs have no adequate remedy at law.  They have suffered, and continue to suffer, immediate and irreparable injury in the deprivation of an equal opportunity to vote and to elect candidates of choice.

## V. CAUSES OF ACTION

### First Cause of Action
#### (Equal Protection Clause of the 14th Amendment to the United States Constitution— Malapportionment)

107.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

108.     This cause of action arises under 42 U.S.C. § 1983 and the Fourteenth Amendment, Section 1, to the Constitution of the United States, which provides in pertinent part: "No State shall make or enforce any law which shall abridge the privileges or immunities of

citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

109.    The Equal Protection Clause requires that the representative and legislative districts used to elect members of the General Assembly be substantially equal in population. *See Reynolds v. Sims*, 377 U.S. 533, 569 (1964) ("We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis.").

110.    The General Assembly enacted representative and legislative plans using five-year ACS data, which provide only population estimates.  The General Assembly did not use P.L. 94-171 data from the 2020 Census, which contains an enumeration of the population.

111.    The General Assembly has failed to comply with its constitutional obligation to enact districts that are sufficiently equipopulous as measured by P.L. 94-171 data.

112.    The June 2021 Plans are therefore malapportioned and violate the one-person, one-vote standard, in violation of the Fourteenth Amendment to the United States Constitution.

### Second Cause of Action

### (Equal Protection Clause of the 14th Amendment to the United States Constitution – Racial Gerrymandering)

113.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

114.    This cause of action arises under the Fourteenth Amendment, Section 1, to the Constitution of the United States.

115.    The SB 927 Plans use race as a predominant factor to allocate Latino voters into and out of House District 21.

116.    The SB 927 Plans use race as a predominant factor to allocate Latino voters into and out of Senate District 11.

117.    The use of race as the predominant factor in SB 927's configurations of House District 21 and Senate District 11 is not narrowly tailored to serve a compelling state interest.

118.    Defendants have no compelling interest in use of race as a predominant factor for allocating voters in the SB 927 Plans.

119.    Accordingly, Defendants' enactment and use of the boundaries for House District 21 and Senate District 11 in the SB 927 Plans discriminate against individual Plaintiffs and members of organizational Plaintiffs PRBA and HLAI on the basis of race and violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## Third Cause of Action

### (Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301)

120.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

121.    The SB 927 Illinois House and Senate Plans adopted and implemented by Defendants for the 2021 election for members of the General Assembly will result in the denial or abridgement of the right to vote of individual Plaintiffs and organizational Plaintiffs PRBA's and HLAI's members on account of their race, color, or ethnicity, by having the effect of diluting their voting strength as minorities in Illinois.

122.    The SB 927 Illinois House and Senate Plans do not afford Plaintiffs an equal opportunity to participate in the political process and to elect representatives of choice and deny individual Plaintiffs and members of organizational Plaintiff PRBA the right to vote in elections

without distinction of their race, color, or ethnicity in violation of 52 U.S.C. § 10301, in adopted House Districts 3, 4, 21, 24, and 39, and in adopted Senate Districts 2 and 11.

## ATTORNEY'S FEES

123.    In accordance with 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988(b), Plaintiffs are entitled to recover reasonable attorney's fees, expenses, and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the following relief:

1.  A declaratory judgment that the June 2021 Plans violate the Equal Protection Clause of the Fourteenth Amendment and that the SB 927 plans violate section 2 of the VRA and the Fourteenth Amendment;

2.  A preliminary and permanent injunction enjoining Defendants from certifying petitions or conducting future elections for the General Assembly under the June 2021 Plans or the SB 927 plans;

3.  An injunction requiring Defendants to draw and establish maps that comply with the one-person, one-vote principles of the Fourteenth Amendment, as measured by P.L. 94-171 data released following the 2020 Census, and that comply with section 2 of the Voting Rights Act and the Fourteenth Amendment;

4.  Recovery of all costs against Defendants, including reasonable attorney's fees;

5.  Continuing jurisdiction to render any and all further orders that this Court may from time to time deem appropriate; and

6.  Such other and further relief as this Court deems just and proper.

Dated: October 1, 2021

*/s/ Julie Bauer*
Julie A. Bauer (no. 6191271)
Nathan R. Gilbert (no. 6326946)
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
Tel: (312) 558-8907
Email: JBauer@winston.com
Email: NRGilbert@winston.com

Respectfully submitted,

*/s/ Griselda Vega Samuel*
Griselda Vega Samuel (no. 6284538)
Francisco Fernandez del Castillo
(no. 6337137)
MEXICAN AMERICAN LEGAL DEFENSE AND
EDUCATIONAL FUND
11 E. Adams St., Suite 700
Chicago, IL 60603
Telephone: (312) 427-0701
Facsimile: (312) 588-0782
Email: gvegasamuel@maldef.org
Email: ffernandez-delcastillo@maldef.org

Thomas A. Saenz (*pro hac vice*)
CA State Bar No. 24005046
Ernest Herrera (*pro hac vice*)
CA State Bar No. 335032
Denise Hulett
CA State Bar No. 121553
MEXICAN AMERICAN LEGAL DEFENSE AND
EDUCATIONAL FUND
643 S. Spring St., 11th Fl.
Los Angeles, CA 90014
Telephone: (213) 629-2512
Email: tsaenz@maldef.org
Email: eherrera@maldef.org
Email: dhulett@maldef.org

*Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on October 1, 2021, a copy of the above Second Amended Complaint was filed electronically in compliance with Local Rule 5.9. All other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing.


<u>/s/ Griselda Vega Samuel</u>
ATTORNEY FOR PLAINTIFFS