**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JULIE CONTRERAS, IRVIN FUENTES, ABRAHAM MARTINEZ, IRENE PADILLA, and ROSE TORRES

Plaintiffs,

v.

ILLINOIS STATE BOARD OF ELECTIONS, CHARLES W. SCHOLZ, IAN K. LINNABARY, WILLIAM J. CADIGAN, LAURA K. DONAHUE, WILLIAM R. HAINE, WILLIAM M. MCGUFFAGE, KATHERINE S. O'BRIEN, and CASANDRA B. WATSON in their official capacities as members of the Illinois State Board of Elections, DON HARMON, in his official capacity as President of the Illinois Senate, and THE OFFICE OF THE PRESIDENT OF THE ILLINOIS SENATE, EMANUEL CHRISTOPHER WELCH, in his official capacity as Speaker of the Illinois House of Representatives, and the OFFICE OF THE SPEAKER OF THE ILLINOIS HOUSE OF REPRESENTATIVES,

Defendants.

Case No. 1:21-cv-3139

Circuit Judge Michael B. Brennan
Chief Judge Jon E. DeGuilio
Judge Robert M. Dow, Jr.,
Three-Judge Court
Pursuant to 28 U.S.C. § 2284(a)

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**

Defendants Don Harmon, in his official capacity as President of the Illinois Senate, the Office of the President of the Illinois Senate, Emanuel "Chris" Welch, in his official capacity as Speaker of the Illinois House of Representatives, and the Office of the Speaker of the Illinois House of Representatives (collectively, "Defendants") hereby submit this Opposition to Plaintiffs' Motion to Compel Legislative Defendants to Respond to Plaintiffs' Discovery Requests (ECF No. 94) (the "Motion").

## I. INTRODUCTION

Plaintiffs' Motion is marked by overreach, disregard for the law, and a refusal to compromise, and is thus illustrative of their conduct over the three weeks since they served their Category 1 discovery.[1] Defendants have worked quickly and tirelessly to respond to voluminous discovery, answer follow up questions via email, attend multiple meet and confers, make multiple productions, and create and twice update their privilege log to provide additional information, all with the explicit stated intention of avoiding motion practice. Unfazed by Defendants' compromises and the extensive, *pre-complaint* discovery they have received, Plaintiffs filed the present Motion, which should be denied in its entirety because the category of evidence it seeks is unquestionably protected by legislative privilege under the very authorities Plaintiffs rely on. Most notably, the court in *Committee for a Fair & Balanced Map v. Illinois State Board of Elections* denied the plaintiffs' motion to compel almost identical materials on legislative privilege grounds. No. 11 C 5065, 2011 WL 4837508, at *11 & n. 11 (N.D. Ill. Oct. 12, 2011).

Plaintiffs move to compel any "previous drafts" of the legislative maps embodied in Senate Bill 927, now signed into law at Public Act 102-663 ("the August Map"). Herrera Decl., Ex. A,

[1] "Categories" are those established in the Court's September 8, 2021 Order. *See* ECF No. 76.

ECF No. 94-2 at 18. As Defendants repeatedly explained to Plaintiffs, they have already produced the complete drafts of the August Map. The materials Plaintiffs move to compel are not completed drafts, but rather the legislative staffers' unfinished work product in creating the August Map. Specifically, Plaintiffs seek the partial, incomplete versions of the map that exist as separate documents only because, unlike most software programs that save over past changes with each hit of the "save" button, the redistricting software creates a separate "version" of the under-development map each time the user hits "save." Therefore, each time any legislative staffer hit "save" while creating the August Map—whether because the day was over, it was time to leave for lunch, or just to be careful—a separate version of a partial, incomplete map was created. These versions are all pre-decisional work product by legislative staff, and inherently contain legislative staff opinions, all of which makes them subject to legislative privilege. *See Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *2 n. 2, 11 & n. 11 (denying plaintiffs' motion to compel "any draft drawings of any Districts of the 2011 Map" and "data files and drafts of data files used to formulate the composition of Districts" because such materials were protected by legislative privilege). Plaintiffs' motion should be denied.

## II. RELEVANT BACKGROUND

The Illinois General Assembly passed the August Map with a supermajority in both chambers on August 31, 2021. Governor Pritzker signed the August Map into law on September 24, 2021, as Public Act 102-663. After a hearing the following day, the Panel indicated that Plaintiffs would be entitled to some pre-complaint discovery—"with the objective of clarifying the legal challenges to and defenses of the new map by the 10/1/2021 deadline for filing an amended complaint[.]" ECF No. 72 at 2.

Pursuant to the Panel's order, Defendants provided, or offered to provide in short order when available, all discovery and responses that they provided or were ordered to provide related to Public Act 102-0010 ("the June Map"). Given that a plaintiff usually is entitled to no pre-complaint discovery, Defendants hoped this would streamline the Category 1 discovery process, eliminate the need for lengthy meet and confers and motion practice, and conserve the Parties' resources.

Plaintiffs did not serve any new discovery requests until eleven days later on September 13—the last day such discovery was allowed under the Court's Order. ECF No. 76 at 2. This inexplicable delay consumed nearly half the time Plaintiffs were granted to conduct discovery, and thereby created an unmanageable rush, the burden of which has fallen on Defendants as they have strived to answer Plaintiffs' discovery and subsequent demands in a matter of days.

Despite Defendants' earlier productions, Plaintiffs propounded voluminous discovery on September 13. In doing so, they took the position that the Court's order, ECF No. 72 at 2, licensed them to full-blown discovery into any claim that might possibly exist in a redistricting context, and rebuked Defendants' position that their overbroad, voluminous discovery offended established limits on relevance and proportionality "at this [pre-complaint] stage of the case" under Federal Rule of Civil Procedure 26. Plaintiffs were unwavering in this position, despite Defendants pointing to several indications that the Court intended their pre-complaint discovery to be limited, including: (i) the extremely expedited schedule for Defendants to respond and produce; (ii) the existence of subsequent Categories after their Second Amended Complaint was filed; (iii) the Court's clear statements that discovery on the then-operative amended complaints was closed, *see* Sept. 7, 2021 Hr'g Tr. at 5:15-17, 8:3-8; and (iv) the Court's limitation on the number of Interrogatories Plaintiffs could propound to just five. Despite this, Plaintiffs served eight Requests

for Admission and twenty-five Requests for Production of Documents—which called for the production of "all documents and communications" rather than that which would be sufficient "to clarify" their claims, and documents dating back to January 1, 2021.[2]

Defendants responded to all of Plaintiffs discovery on the ordered deadline, September 20, 2021. On September 21, Plaintiffs requested a meet and confer, and Defendants made themselves available on September 22. *See* ECF No. 76 at 2 ("[C]ounsel must make themselves available to engage in meet and confer conversations . . . within 48 hours of a request for such a conversation[.]"). The Parties' September 22 conferral lasted nearly two hours. Both sets of Plaintiffs demanded that Defendants respond in full to all of their requests, despite Defendants' position that the Court had not intended such overbroad, limitless discovery during Category 1, and that in any event, the volume of Plaintiffs' discovery was unduly burdensome on Defendants on such a compact schedule. After refusing to defer *any* of their discovery until after the Second Amended Complaints were filed, Plaintiffs agreed to defer ten requests only after Defendants stated their intent to move the Court for a protective order.[3] *See* Yandell Decl., Ex. C. These "deferrals" were meaningless, however, as Defendants had already fully responded to eight of the ten deferred requests, and the other two requests are undeniably irrelevant to any potential claim Plaintiffs could have brought (and indeed are not be relevant to the claims in the Second Amended Complaint).

Defendants provided substantive responses to the issues raised by Plaintiffs during the meet

---

[2] The McConchie Plaintiffs similarly served four interrogatories and sixteen requests for production.

[3] At Defendants' request, Plaintiffs also agreed to narrow their discovery—which initially requested discovery related to all 177 legislative districts in Illinois—to priority districts. Plaintiffs' priority districts were still overbroad, however, requesting discovery into thirty-six districts. Plaintiffs' Amended Complaint challenges seven districts. *See* Yandell Decl., Ex. C.

and confer the next morning, September 23, and served formalized, supplemental discovery responses later that day. *See* Yandell Decl., Ex. A.[4] Over the next several days, Defendants would make two supplemental productions, create and twice update their privilege log, attend a second conferral with Plaintiffs, and answer multiple questions via email. Defendants have now responded to, produced, or provided access to the following discovery:

- 2020 Census (P.L. 94-171) Redistricting Data;
- Senate Bill 927;
- House Resolution 443;
- Shape files and block equivalency files that comprise the August Map;
- Additional precinct shape files used to disaggregate from the precinct to the block level;
- A list of elections that were used to create Plaintiffs' priority districts in the August Map;
- Senate Resolution 3 of the 1st Special Session of the 102nd General Assembly;
- Transcript of House Floor Debate on Senate Bill 927 and House Resolution 443;
- Transcripts of House Redistricting Committee Hearings;
- Transcripts of Senate Redistricting Committee Hearings;
- House Redistricting Plan Data Matrix;
- Senate Redistricting Plan Data Matrix;
- Written testimony submitted to the House Redistricting Committee;
- Written testimony submitted to the Senate Redistricting Committee;
- Proposed map submissions from redistricting hearing witnesses;

---

[4] Defendants note that Plaintiffs provided only Defendants' initial discovery responses with their Motion. Defendants have therefore attached hereto their September 23, 2021 supplemental responses, which are the current responses. *See* Yandell Decl., Exs. A, B.

- Any analysis related to racially polarized voting;
- Communications between Defendants and their redistricting consultants related to the August Map;
- All data provided by Defendants to their consultants related to the August Map;
- All data provided by Defendants to their consultants related to racially polarized voting;
- Communications between Defendants and members of the legislature identified by Plaintiffs' requests related to the August Map; and
- The identities of legislative staffers that worked on the August Map, *despite such information being protected by legislative privilege*.

Defendants also confirmed, following an investigation, that no documents exist in response to several of Plaintiffs' requests. *See* Yandell Decl., Ex. A. At Plaintiffs' request, Defendants also revisited their privilege log and agreed to withdraw their privilege assertion as to one document, and explained in detail that the remaining documents Plaintiffs were pushing for related only to the June Map, and thus were not relevant.

Defendants were explicit that their efforts, compromises, and agreements to provide almost everything Plaintiffs asked for were to one end: avoiding motion practice. Still, Plaintiffs moved to compel one category of evidence that is plainly protected by legislative privilege, including under their primary authority.[5] *See Comm. for a Fair & Balanced Map,* 2011 WL 4837508, at *11 & n. 11.

---

[5] Plaintiffs' Motion was due Thursday, September 30 by 12:00 p.m. Central Time—an extension of six days from their original due date that Plaintiffs themselves requested. *See* ECF No. 92. Plaintiffs did not file their Motion until 6:30 p.m. Central Time that day, without so much as a notice to Defendants that their Motion would be late or was still forthcoming, or an explanation (or any mention) of their missed deadline to the Court. Defendants request the Court admonish Plaintiffs' brazen disregard for its deadlines, especially in light of Defendants' short window to respond.

## III. LEGAL STANDARD

The legislative privilege "shields from disclosure pre-decisional, non-factual communications that contain opinions, recommendations or advice about public policies or possible legislation." *Id.* at *10. The legislative privilege exists because:

> [T]he need for confidentiality between lawmakers and their staff is of the utmost importance. Legislators face competing demands from constituents, lobbyists, party leaders, special interest groups and others. They must be able to confer with one another without fear of public disclosure. In this respect, the legislature is not unlike other branches of government. As noted by the Third Circuit, a "legislator's need for confidentiality is similar to the need for confidentiality in communications between judges, between executive officials, and between a President and his aides.

*Id*. at *8-9 (citing *In re Grand Jury*, 821 F.2d 946, 957 (3d Cir. 1987)). The legislative privilege can be overcome only by a showing of need. Courts consider five factors when determining whether the privilege applies: "(i) the relevance of the evidence sought; (ii) the availability of other evidence; (iii) the seriousness of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable." *Id*. at *7.

## IV. ARGUMENT

### A. The Materials Plaintiffs Seek Are Pre-Decisional, Unfinished Work Product

Plaintiffs' Request for Production No. 6 seeks "[a]ll documents relating to the development, creation, revision, or purpose of previous drafts of the S.B. 927 plans." Herrera Decl., Ex. A, ECF No. 94-2 at 18. "Draft maps" in the redistricting context typically refer to completed, alternate versions of a challenged map—created by defendants, plaintiffs, or others—that Plaintiffs can point to as a reasonable alternative that would support their claims of vote dilution. For instance, Plaintiffs cite to *Luna v. County of Kern*, which addressed completed alternate map "options." 291 F. Supp. 3d 1088, 1105-06 (E.D. Cal. 2018) (explaining that a Voting Rights § 2 plaintiff must "postulate a reasonable alternative voting practice to serve as the

benchmark 'undiluted' voting practice") (citations omitted). Typically, it is plaintiffs who "present illustrative redistricting plans as evidence of vote dilution" because their burden of demonstrating a constitutional alternative often involves "the creation of hypothetical districts."[6] *Id*. at 1106 (citations omitted).

In the present case, Plaintiffs have not presented any alternative proposals to the August Map—neither currently nor during the deliberative process, of which they were a part. Defendants only created two such complete, alternate versions of the August Map, and have produced those maps along with the corresponding shape files and block equivalency files. To the extent community groups or other witnesses submitted proposed alternate maps to the General Assembly, Defendants have also made those available to Plaintiffs.

The materials Plaintiffs seek are not completed maps that could serve as constitutional alternatives and therefore help Plaintiffs prove their Voting Rights Act § 2 claims, as described above. Rather, they seek production of the legislative staffers' work product—presuming the staffers created a step-by-step guide that will show how they arrived at a complete draft August Map. As Defendants described them to Plaintiffs during their conferral, they are:

> [C]opies of the under-development, incomplete map document each time the user hits 'save.' So every time the group left for lunch, left for the night, etc., and hit 'save' there is a work-product-protected, incomplete, partially drawn version of the map that became would later become what was filed as Senate Bill 927. They are pre-decisional, non-factual documents prepared by or in consultation with legislators that contain opinion (not facts), recommendations, or potential advice about the development of policies or possible legislation (ie, the redistricting plan).

---

[6] Plaintiffs' suggestion that the *Luna* court considered the government-created "options" maps under *Thornburg v. Gingles*, 478 U.S. 30 (1986), is incorrect. *See* Mot. at 7. In discussing *Gingles*, the court considered *plaintiffs'* proposed alternative maps. *See Luna*, 291 F. Supp. 3d at 1105-1123 (evaluating "Illustrative Map 1" and "Illustrative Map 2" developed by plaintiffs' "demography expert, David R. Ely").

Herrera Decl., Ex. B, ECF No. 94-2 at 32. Using a judicial opinion as an analogy, producing these materials would be the same as producing the version of the opinion after the "Introduction" was written, and then another version once the "Factual Background" had been added, and so on, all before a judge had made a final decision as to the holding. These materials are privileged because they represent legislative work product, they inherently contain the authors' opinions (or such opinions can be deduced therefrom), because better and copious evidence of the legislative process exists and has been produced, and because disclosure would having a chilling effect on this necessary legislative process.

**B. Legislative Privilege Protects the Materials Plaintiffs Seek**

*Committee for a Fair & Balanced Map*, 2011 WL 4837508, is a decision of the three-judge panel of this Court which adjudicated challenges to Illinois's 2011 redistricting map (passed following the 2010 Census). *Committee for a Fair & Balanced Map* is directly on point because the plaintiffs there brought similar claims pleaded in Plaintiffs' Second Amended Complaint, and the court considered whether the legislative privilege protected the same type of evidence at issue in this Motion, namely, "any draft drawings of any Districts of the 2011 Map" and "data files and drafts of data files used to formulate the composition of Districts" *Id*. at *2 n.2. Though cited heavily in Plaintiffs' Motion, the case supports Defendants' position, as it explicitly holds that the draft drawings, as well as "a plethora of documents concerning the planning, development, negotiation, and drawing of the 2011 [legislative redistricting] Map" were protected by legislative privilege. *Id*. at *2, *11 & n.11.

The *Committee for a Fair & Balanced Map* court engaged in a thorough analysis of the five factors to determine whether legislative privilege protected the materials: "(i) the relevance of the evidence sought; (ii) the availability of other evidence; (iii) the seriousness of the litigation and

the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable." *Id*. at *7. Although the second and third factors weighed in favor of disclosure, *id*. at *8, the court held that the remaining factors dictated that legislative privilege protected the materials.

Specifically, the court considered the relevance of the evidence sought in conjunction with the availability of other evidence. *Id*. at *8. Though the materials at issue had some relevance to the plaintiffs' claims, the Court explained that the evidence, which the plaintiffs sought to prove "the individual motives and objectives of those who drafted the 2011 Map," was "not critical to the outcome of the case." *Id*. at *4. Rather, "the most important events [] are those undertaken by the legislative body, such as public hearings, committee meetings and floor debates." *Id*. Because the plaintiffs already had this and "considerable other information at their fingertips, [] includ[ing] public hearing minutes, special interest group position papers, statements made by lawmakers during debate, committee reports, press releases, newspaper articles, census reports, registered voter data and election returns" the first and second factors weighed in favor of applying the privilege. *Id*. at *8.

The court then found that the fifth factor favored the privilege because disclosure would cause future timidity by government employees. Like here, the materials at issue were "likely to contain the motives, impressions, and/or opinions of those responsible for drafting the 2011 Map." *Id*. at *3. The court explained that disclosure of such materials would "discourage earnest discussion within government walls," and rejected the plaintiffs' position that the infrequency of redistricting cut against the legislative privilege. *Id*. at *8-9. To the contrary, "in the redistricting context, full public disclosure would hinder the ability of party leaders to synthesize competing interests of constituents, special interest groups and lawmakers, and draw a map that has enough

support to become law." *Id*. at *9. The privilege was therefore necessary because "the need for confidentiality between lawmakers and their staff is of utmost importance. Legislators face competing demands from constituents, lobbyists, party leaders, special interest groups and others. They must be able to confer with one another without fear of public disclosure."[7] *Id*. at *8.

The evidence Plaintiffs seek in with this Motion is unquestionably protected by legislative privilege under *Committee for a Fair & Balance Map*. As discussed above, that case was decided during the most recent redistricting in Illinois, and the Court considered the privilege's application to the *same type of evidence* in a case that brought *the same claims* as do Plaintiffs here. Like they did in 2011, the first, second, and fifth factors dictate that the materials at issue are protected by legislative privilege.

Regarding the first and second factors—relevance and the availability of other evidence—the same circumstances exist in this case as in *Committee for a Fair & Balance Map*: (i) the draft drawings of the August Map contain and would reveal "the individual motives and objectives of those who drafted the [August] Map, *id*. at *4; (ii) the "most important" evidence of the legislative process are "the public hearings, committee meetings and floor debates," *id*.; and (iii) Defendants have already produced or provided access to all such evidence and more, including all data and facts used to create the August Map, *id* at *8. *See also supra* at 5-6 (listing Defendants' productions). Because Plaintiffs have the best available evidence to prove their claims, and plenty of it, the first and second factors weigh in favor of applying the privilege.[8]

---

[7] The Court's order also sustained the objection to, for example, Plaintiff's request No. 2, which asked for "[a]ll Documents, including, but not limited to, reports, analyses, election results or other election data, and Communications pertaining or relating to the planning, development, negotiation, drawing, revision or re-drawing of the Proposed Congressional Plan." *See id*. at 2 n.2.

[8] Much of the work product Plaintiffs request is not relevant at all because it does not relate to the seven districts they now challenge in the Second Amended Complaint. *See* ECF No. 98 ¶¶ 76-98.

The fifth factor also weighs strongly in favor of the privilege. Should this Court reverse course from the 2011 *Committee for a Fair & Balanced Map* decision, legislators and their staff will be "forced to recognize that their secrets are violable." *Id.* at *7. Knowledge that any work product might be discoverable—no matter how preliminary, incomplete, incorrect, or subject to input it may be—would chill legislative staffers' willingness to save their work along the way. But map drawing requires trial and error to achieve the ideal population for each district, and redrawing a single district line can cause demographic shifts and affect multiple communities of interest or minority groups. Those adjustments are necessary means to an end, and indeed, most changes are not incorporated into the final map. As the *Committee for a Fair & Balanced Map* court recognized, redistricting legislators and staffers' work product must be protected if they are to "synthesize competing interests of constituents, special interest groups and lawmakers, and draw a map that has enough support to become law." *Id.* at *9. Any contrary ruling would create timidity by government employees not only during future redistricting, but in their current, ongoing Congressional redistricting efforts. The Court should find, consistent with its precedent, that the legislative work product at issue here is protected by legislative privilege, and deny the Motion.[9]

## V. CONCLUSION

Defendants respectfully request that the Court deny Plaintiffs' Motion in its entirety.

---

[9] The other cases Plaintiffs rely on are distinguishable on important grounds. *See* Mot. at 7. Neither opinion from *Perez v. Abbott* were motions to compel, there is no indication there was ever any dispute over the production of any draft maps, and there is no mention of legislative privilege. *See Perez v. Abbott*, 250 F. Supp. 3d 123 (W.D. Tex. 2017); *Perez v. Abbott*, No. 11-cv-360, 2017 WL 1406379, at *35 (W.D. Tex. Apr. 20, 2017). The same in true of *Luna*, 291 F. Supp. 3d 1088, which was a final determination after a bench trial (not a motion to compel) in which draft maps were already in the findings of fact. Importantly, unlike here, the draft maps were complete, alternate map "options" most of which had been created during public workshops, thereby undercutting any claim to privilege (had it been raised). *Id.* at 1101–05.

Dated: October 5, 2021

Respectfully submitted,

/s/ Sean Berkowitz

Michael J. Kasper
151 N. Franklin Street
Suite 2500
Chicago, IL 60606
(312) 704-3292
mjkasper@60@mac.com

*Counsel for Defendants Welch, Office of the Speaker, Harmon, and Office of the President*

Devon C. Bruce
Power Rogers, LLP
70 W. Madison St., Suite 5500
Chicago IL, 60606
(312) 236-9381
dbruce@powerrogers.com

*Counsel for Defendants Welch, Office of the Speaker, Harmon, and Office of the President*

Heather Wier Vaught
Heather Wier Vaught, P.C.
106 W. Calendar Ave, #141
LaGrange, IL 60625
(815) 762-2629
heather@wiervaught.com

*Counsel for Defendants Welch, Office of the Speaker, Harmon, and Office of the President*

Sean Berkowitz
Latham & Watkins LLP
330 N. Wabash, Suite 2800
Chicago, IL 60611
(312) 777-7016
sean.berkowitz@lw.com

Colleen C. Smith
Latham & Watkins LLP
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400
colleen.smith@lw.com

Elizabeth H. Yandell (*pro hac vice pending*)
Latham & Watkins LLP
505 Montgomery St., Suite 2000
San Francisco, CA 94111
(415) 391-0600
elizabeth.yandell@lw.com

*Counsel for Defendants Harmon and Office of the President*

Adam R. Vaught
Hinshaw & Culbertson LLP
151 North Franklin Street, Suite 2500
Chicago, IL 60606
(312) 704-3000
avaught@hinshawlaw.com

*Counsel for Defendants Welch, Office of the Speaker, Harmon, and Office of the President*