## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DAN MCCONCHIE, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 21 CV 3091 |
| | ) | |
| CHARLES W. SCHOLZ, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and, | ) | |
| | ) | |
| ANGELICA GUERRERO-CUELLAR, | ) | |
| in her official capacity as Illinois State | ) | |
| Representative for the 22nd District and | ) | |
| Individually, | ) | |
| | ) | |
| Petitioner/Defendant-Intervenor) | | |

| | | |
|---|---|---|
| JULIE CONTRERAS, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 21 CV 3139 |
| | ) | |
| ILLINOIS STATE BOARD OF | ) | |
| ELECTIONS, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and, | ) | |
| | ) | |
| ANGELICA GUERRERO-CUELLAR, | ) | |
| in her official capacity as Illinois State | ) | |
| Representative for the 22nd District and | ) | |
| Individually, | ) | |
| | ) | |
| Petitioner/Defendant-Intervenor) | | |

1

## PETITIONER/DEFENDANT-INTERVENOR'S AMENDED[1] MOTION AND MEMORANDUM OF LAW TO INTERVENE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 24

NOW COMES Petitioner/Defendant-Intervenor, Angelica Guerrero-Cuellar (the "Representative") by and through her attorney Veronica Bonilla-Lopez of Del Galdo Law Group, LLC., and moves to intervene as a Defendant pursuant to Federal Rule of Civil Procedure 24 in the actions filed by Dan McConchie, et al. and Julie Contreras, et al. (Respectively hereinafter "*McConchie*" and "*Contreras*") and in support thereof states as follows:

### INTRODUCTION

The Representative is an Illinois State Representative for the 22nd District of Illinois which is home to a large Latino/a/x population and includes neighborhoods that surround Midway Airport. She also is a Latina who is a registered voter in her District. She seeks to intervene as a Defendant in this matter as of right for the following reasons: 1) the motion is timely; 2) the Representative has a significant interest both in her official and individual capacity; 3) the disposition of this matter impairs or impedes the Representative's ability to protect her interest in this matter; and, 4) the existing parties fail to adequately represent the unique and specific interests of the Representative. The Representative otherwise moves to intervene by permission where: 1) the motion is timely; 2) the Representative raises a defense that shares common questions of law and fact to the main action; and 3) if the motion were

---

[1] Petitioner's prior Motion to Intervene filed in *Contreras* was withdrawn without prejudice. (*Contreras*, Dkt. #77)

to be denied, the Representative would be prejudiced. Alternatively, the Representative seeks to permissibly intervene for a limited purpose.

ARGUMENT

I. The Representative Should be Granted Leave to Intervene as of Right

Federal Rule of Civil Procedure 24(a)(2) provides in relevant part that on timely motion, the court must permit anyone to intervene who: claims an interest relating to the … transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest. Accordingly, there is a four-part test to intervention as of right: 1) timely application; (2) an interest relating to the subject matter of the action; (3) potential impairment, as a practical matter, of that interest by the disposition of the action; and, (4) lack of adequate representation of the interest by the existing parties to the action. *PAC for Middle America v. State Bd. of Elections*, 1995 WL 571893, *2, Case no. 95 C 827 (N.D. Ill. 1995) citing *Shea v. Angulo,* 19 F.3d 343, 346 (7th Cir.1994). A motion to intervene as a matter of right should not be dismissed unless it appears with certainty that the intervenor is not entitled to relief under any set of facts. *Lake Investors Development Group, Inc. v. Egidi Development Group*, 715 F.2d 1256, 1258 (7th Cir. 1983).

a. The Motion is Timely

Timeliness involves examining all of the circumstances of a case and is to be determined by the court in the exercise of its discretion. *Smith v. Board of Election*

*Com'rs for City of Chgo.*, 103 F.R.D. 161, 163 (N.D. Ill. 1984) citing *NAACP v. New York,* 413 U.S. 345, 365–66, (1973). Four factors are considered to determine whether a motion to intervene is timely: (1) the length of time the intervenor knew or should have known of his or her interest in this case, (2) the prejudice to the original party caused by the delay, (3) the resulting prejudice to intervenor if the motion is denied, and (4) any unusual circumstances. It is a reasonableness standard: "potential intervenors need to be reasonably diligent in learning of a suit that might affect their rights, and upon so learning they need to act reasonably promptly." *PAC*, 1995 WL 571893 *3 citing *Nissei Sangyo Am., Ltd. v. United States,* 31 F.3d 435, 438 (7th Cir.1994).

The Representative's motion to intervene is timely. Plaintiffs have filed amended complaints on October 1, 2021. (*McConchie* Dkt. #116 & *Contreras* Dkt. #98). In the Complaints, as discussed in more detail below, the Plaintiffs challenge the 22nd District in seeking to change its boundaries to create additional "Latino" House Districts. (*McConchie* Dkt. #116, ¶¶ 8, 10a & *Contreras* Dkt. #98, ¶¶ 74, 76-88). The *McConchie* Complaint proposes a revised September map that cuts through the 22nd District and the *Contreras* Plaintiffs assert that "district elections in the areas in and around" House District 21, which is west of the 22nd District, are racially polarized. (*McConchie*, Dkt. #116, ¶¶ 75-76, *Contreras* #98, ¶ 99). On October 19, 2021, the three-judge panel (the "Panel") granted summary judgment in favor of the Plaintiffs and ruled among other things that the Plaintiffs shall submit proposed revisions to the September Redistricting Plan. (*McConchie* Dkt #131, *Contreras* Dkt

#117). As such, the Representative hereby having notice that her direct interests are at stake, files this motion reasonably promptly. Next, no prejudice to the original parties will occur by permitting the Representative to intervene. The Representative attaches to her motion, an answer to each Complaint and agrees to abide by any current schedules. See *PAC*, 1995 WL 571893 *4 (finding a motion to intervene filed three months after the Plaintiff's complaint to be timely). In fact, prejudice will result to the Representative should her motion to intervene be denied as she would be left without any recourse to protect her interests. See *Smith*, 103 F.R.D. at 163 (motion to intervene by registered voters not untimely where intervenors would be prejudiced if denied and parties were briefing summary judgment motions). The Representative has met all the factors to demonstrate her motion is timely.

b. The Representative has a Substantial Legal Interest in the Case

What constitutes an "interest" is defined broadly and is described as one which is "significantly protectable." *Lake Investors*, 715 F.2d at 1259. The Complaints in the captioned consolidated matters seek declaratory judgments declaring the September and June maps invalid and unconstitutional. (*McConchie* Dkt. #116, ¶15 & *Contreras* Dkt. #98, ¶¶ 2-3).

The *McConchie* Complaint explicitly proposes a revised September map that cuts through the 22nd District. (*McConchie* Dkt. #116, ¶¶ 75-76). In their Complaint, *Contreras* Plaintiffs contend that by moving "Latinos into other districts and out of House District 21," which is located directly west of the 22nd District, the September Plan uses race as a predominant factor. (*Contreras* Dkt #98, ¶ 83). The *Contreras*

Complaint further attacks the change of "nested house district" compositions of Senate District 11 which includes the 22nd District. (*Contreras* Dkt #98, ¶¶ 94-95). In the Complaint, the *Contreras* Plaintiffs assert that "district elections in the areas in and around House Districts 3, 4, 21, 24 and 39, and Senate Districts 2 and 11, are characterized by racially polarized voting." (*Id.* at ¶ 99). The 22nd District is "in and around" the districts enumerated. In other words, the respective Complaints challenge the 22nd District.

The Representative has a valid and substantial interest in her official capacity as the Illinois State Representative of the 22nd District and in her individual capacity to protect her right to re-election. See *PAC for Middle America v. State Bd. of Elections*, 1995 WL 571893, *2, Case no. 95 C 827 (N.D. Ill. 1995)(concession by plaintiffs that congressman who may lose his base electorate as a result of an adverse ruling, may intervene as of right); *Johnson v. Mortham*, 915 F. Supp. 1529, 1538 (N.D. Fla. 1995)(congresswoman whose district is being challenged granted leave to intervene as of right where she has a direct, substantial, and legally protectable interest); *Williams v. State Board of* Elections, 696 F. Supp. 1563, 1571-72 (N.D. Ill. 1988)(elected officials whose electoral districts are challenged as unlawful have "personal interests in their office," "equitable interests" in the timing and form of relief, and interests in their continued incumbency); *Texas Democratic Party v. Benkiser*, 459 F. 3d 582, 586-588 (5th Cir. 2006)(an injury in fact exists when a candidate's election prospects and campaign coffers are threatened); *League of Woman Voters of Mich. v. Johnson,* 902 F. 3d 572, 579 (6th Cir. 2018)(congressmen

interests in intervening in a suit included the relationship between constituent and representative).

Additionally, the Representative as a registered Latina voter within the 22nd District has a personal interest in the causes of action. "[V]oting implicates fundamental rights which are integral to a democratic society. These include the right to associate with others for the common advancement of political beliefs and ideas. The right of qualified voters to associate with the political party of their choice through voting is central to our basic constitutional freedoms." *Smith*, 103 F.R.D. at 163 citing *Smith v. Board of Election Commissioners*, 587 F.Supp. 1136, 1146 (N.D. Ill. 1984); and <u>see</u> *Johnson*, 915 F.Supp. at 1536 (registered voters have standing, and a sufficiently substantial interest to intervene, in an action challenging the voting district in which the voters are registered). The Representative has accordingly established a significant interest in the consolidated cases.

c. <u>Impairment of the Legal Interest is Possible if Intervention is Denied</u>

An interest is considered "impaired when the decision of a legal question … would, as a practical matter, foreclose the rights of the proposed intervenor in a subsequent proceeding." *PAC*, 1995 WL 571893 *2. The burden is minimal and can be satisfied if a determination in the action may result in potential stare decisis. *Id*. Here, a disposition that changes the configuration of the 22nd District is imminent. The consolidated cases have entered the remedial phase where the Panel has instructed the Plaintiffs to submit their proposed revisions to the September Redistricting Plan "accompanied by a statement explaining how those revisions cure

any constitutional or statutory defects in the September Redistricting Plan… no later than November 8, 2021." As detailed above, the proposals will unequivocally contain revisions to the 22nd District. Should the Representative be denied opportunity to intervene, it would impair the Representative's ability to protect her significant interest in her continued incumbency, her relationship with her constituents, and her voting rights. Therefore, the Representative has demonstrated an impairment to her legal interests if the motion to intervene were to be denied.

     d.  <u>The Parties do not Adequately Represent the same Interests</u>

This requirement is satisfied, "if the applicant shows that representation of [her] interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Lake Investors*, 715 F.2d at 1261 citing *Trbovich v. United Mine Workers of America,* 404 U.S. 528, 538 n. 10 (1972). The existing parties to the action do not adequately represent the same interests as that of the elected State Representative for the 22nd District. The Representative has a particular and unique interest to protect her incumbency, the relationship with her constituents of the 22nd District and her voting rights. While the current defendants are opposing the litigation and reconfiguration of the map as a whole, their interests are not specific to the 22nd District or sufficiently protect the Representative's interests. In other words, any disposition or negotiated settlement that implicates the 22nd District will not be of any consequence to the current parties. <u>See</u> *Johnson*, 915 F.Supp. at 1538 (congresswoman has a personal interest in her office that goes beyond more general interest that she and the government have in keeping her district intact). The parties,

accordingly, fail to adequately represent the same interests as that of the Representative.

II.　　<u>The Representative should be Permitted to Intervene</u>

The Court has broad discretion in granting a motion to intervene under Rule 24(b)(1). *PAC* 1995 WL 571893 *3. In deciding whether to grant permissive intervention, the court must consider: (1) whether the petition was timely; (2) whether a common question of law or fact exists; and (3) whether granting the petition to intervene will unduly delay or prejudice the adjudication of the rights of the original parties. *Id.* citing *Southmark Corp.,* 950 F.2d 416, 419 (7th Cir. 1991); *HHB Ltd. Partnership v. Ford Motor Co.,* Case No. 92 C 3287, 1992 WL 348870, *1 (N.D.Ill.1992).

Timeliness has already been addressed and established as stated in (I.)(a.) of the argument section above. The remaining criteria are also met. The Representative has a "defense that shares with the main action a common question of law and fact." Fed.R.Civ.Pro. 24(b)(1)(B). The Representative seeks to defend the 22nd District against the constitutional attacks. The common questions are the constitutionality of the June and September Plan. Further, the Representative seeks to protect the right to vote, rights to a fair and reasonable opportunity to elect candidates of choice and avoid dilution of Latino/a/x votes which are common questions in the consolidated cases. Additionally, should the Representative be permitted to intervene, it would not prejudice the adjudication of the rights of the parties to this action or unduly delay the proceedings. The Representative's defenses overlap with the defenses put forth

by the current Defendants. See *League of Women Voters of Mich*, 902 F. 3d at 578 (where many of the Congressmen's defenses overlapped with the defendant's, adding the Congressmen would not have placed any unnecessary or unexpected burden upon the district court). Moreover, as mentioned above the Representative would abide by all current schedules. The progression of the case will not be affected. The motion to permissively intervene should be granted.

### III.    Alternatively, Intervention Should be Granted for a Limited Purpose

Alternatively, the Representative requests to permissibly intervene for a limited purpose and scope. Permissive intervention "leaves the district court with ample authority to manage the litigation before it. The court can even place conditions on the scope of permissive intervention, allowing more voices to be heard without overcomplicating the case with additional claims, defenses, discovery, and conflicting positions." *Planned Parenthood of Wisconsin, Inc. v. Kaul*, 942 F.3d 793 (7th Cir. 2019). The Representative's interests as expressed herein are not adequately represented by any of the parties currently in these cases. In order to protect her interests, the Representative seeks leave to intervene for the limited purpose of submitting her responses and objections, in regard to the 22nd District, to Plaintiffs' proposed revisions to the September Redistricting Plan as Defendants have been granted per the Memorandum Opinion and Order of October 19, 2021. (*McConchie*, Dkt. # 131 & *Contreras* Dkt. 117). See *Reynolds v. LaSalle County*, 607 F.Supp. 482, 483 (N.D. Ill. 1985)(Fraternal Order of Police allowed to intervene by permission under Rule 24(b) for limited purpose of objecting to the promotion of two individuals

to deputy sheriff contained in a consent decree); *U.S. v. Navistar International Corp.*, 2016 WL 6948378, Case No. 15 cv 6143, *2 (N.D. Ill. 2016)(granting permissive intervention for limited purpose of protecting sensitive confidential business information); *SEC v. Heartland Group, Inc.*, 2003 WL 1089366, Case No. 01 C 1984, *6 (N.D. Ill. 2003)(granted motion to intervene for limited purpose of contesting motion); *Kerasotes Michigan Theatres, Inc. v. National Amusements, Inc.*, 139 F.R.D. 102, 103 (limited intervention permitted to challenge a protective order); and *Driftless Area Land Conservancy v. Public Service Commission of Wisconsin*, 2020 WL 7186150, Case No. 19-CV-1007-wmc, *3 (W.D. Wis. 2020)(motion to intervene granted for limited purpose of protecting interests during discovery).

## CONCLUSION

The Illinois State Representative should be granted leave to intervene in this matter as of right. She has met all the factors for intervention under Federal Rule of Civil Procedure 24(a)(2). The Panel should otherwise allow permissive intervention under 24(b). Alternatively, the Representative should be granted leave to intervene for a limited purpose.

WHEREFORE, the Representative prays this Panel enter an order granting leave to intervene as of right or as permitted and further grant any and all such other relief this Panel deems just and equitable.

Respectfully Submitted,

ANGELICA GUERRERO-CUELLAR

By: */s/ Veronica Bonilla-Lopez*
    Veronica Bonilla-Lopez

11

*One of the Petitioner- Defendant's Attorneys*

Veronica Bonilla-Lopez (ARDC# 6281050)
Tiffany Nelson-Jaworski (ARDC #6278126)
DEL GALDO LAW GROUP, LLC
(708) 222-7000 (t)/ (708) 222-7001 (f)
1441 S. Harlem Avenue
Berwyn, Illinois 60402
vblopez@dlglawgroup.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JULIE CONTRERAS, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 21 CV 3139 |
| | ) | |
| ILLINOIS STATE BOARD OF | ) | |
| ELECTIONS, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and, | ) | |
| | ) | |
| ANGELICA GUERRERO-CUELLAR, | ) | |
| in her official capacity as Illinois State | ) | |
| Representative for the 22nd District and | ) | |
| Individually, | ) | |
| | ) | |
| Petitioner/Defendant-Intervenor | ) | |

**<u>DEFENDANT'S ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT
AND AFFIRMATIVE DEFENSES</u>**

NOW COMES the Defendant-Intervenor, Illinois State Representative Angelica Guerrero-Cuellar ("The Representative"), by and through her counsel Veronica Bonilla-Lopez of Del Galdo Law Group, LLC, and for her Answer to Plaintiffs' Second Amended Complaint and Affirmative Defenses, states as follows:

1.     This action, which is brought under the United States Constitution and the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10101 *et seq.*, seeks declaratory and injunctive relief against the Illinois state government officials ("Defendants") who are charged with overseeing and conducting elections for state legislative seats and/or redrawing state legislative district boundaries after each decennial census. Ill. Const. art. III, § 5; Ill. Const. art. IV, § 3.

**ANSWE**R: **The Representative admits Plaintiffs are bringing a claim under the United**

1

States Constitution and the Voting Rights Act of 1965 as alleged in Paragraph 1 but denies any violations.

## The SB 927 Plans

2.    Plaintiffs seek a declaratory judgment that the legislative redistricting plans created in Senate Bill 927 ("SB 927 plans"), which were passed on August 31, 2021 and signed by the governor on September 24, 2021, violate Section 2 of the VRA and the Fourteenth Amendment to the United States Constitution because the plans have the effect of diluting the Latino vote and were drawn using race as a predominant factor. Plaintiffs seek permanent and preliminary injunctive relief, prohibiting the calling, holding, or certifying of any future elections using the SB 927 plans.  Plaintiffs further seek the creation of a districting plan that complies with Section 2 and the Fourteenth Amendment and that provides adequate representation for Latinos in Illinois.

**ANSWER: The Representative denies Plaintiffs have stated a claim under the United States Constitution or the Voting Rights Act of 1965. The Representative denies the remaining allegations in Paragraph 2 and denies that Plaintiffs are entitled to any relief.**

## The June 2021 Plans

3.    Plaintiffs seek a declaratory judgment that the legislative redistricting plans created based almost entirely on American Community Survey ("ACS") population estimates for election of representatives and senators to the Illinois General Assembly, which were passed on May 28, 2021 and signed by Illinois Governor J.B. Pritzker on June 4, 2021 ("June 2021 Plans"), are malapportioned in violation of the Fourteenth Amendment to the United States Constitution. Plaintiffs seek preliminary and permanent injunctions prohibiting the calling, holding, or certifying of any future election using the June 2021 Plans. Plaintiffs further seek the creation of a districting plan that is equally apportioned as measured by the 2020 Census redistricting data contained in

2

Public Law 94-171 ("P.L. 94-171") file issued by the U.S. Census Bureau (the "Bureau").

**ANSWER: The Representative admits Plaintiffs seek a declaratory, preliminary and permanent judgment but denies Plaintiffs have stated a claim under the United States Constitution or the Voting Rights Act of 1965. The Representative denies the remaining allegations in Paragraph 3 of the Complaint and denies Plaintiffs are entitled to any relief.**

4.     The General Assembly used data from the ACS five-year estimates for 2015-2019 and "other election data" to draw the boundaries for the districts used to elect members of the General Assembly.

**ANSWER: The Representative admits the General Assembly used ACS data among other data and input in drawing the June 2021 Plan.**

5.     The June 2021 Plans purportedly ensure compliance with the "one-person, one-vote" standard mandated by the Fourteenth Amendment; however, ACS data is inadequate for that purpose, and accordingly, the June 2021 Plans are malapportioned. Absent judicial intervention, the June 2021 Plans may be used in the 2022 general election for the General Assembly, resulting in the vote dilution of Plaintiffs and others who live in overpopulated districts.

**ANSWER: The Representative denies the allegations contained in Paragraph 5 of the Complaint.**

6.     Under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, state legislative districts are required to be of substantially equal population. This requirement is encompassed in the "one-person, one-vote" standard. Under this standard, states must create legislative districts that are substantially equal in population, and the states are responsible for regularly reapportioning these districts to ensure constitutional compliance.

**ANSWER: The Representative admits the U.S. Constitution speaks for itself and denies any**

**violation.**

7. Plaintiffs seek a declaratory judgment that the June 2021 Plans violate the Fourteenth Amendment to the United States Constitution and an order enjoining the implementation of the June 2021 Plans.

**ANSWER: The Representative admits Plaintiffs seek a declaratory judgment but denies a violation of the U.S. Constitution and denies that Plaintiffs are entitled to any relief.**

## II.    JURISDICTION AND VENUE

8. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' malapportionment claim, which arises under the laws of the Constitution of the United States. This Court has original jurisdiction over Plaintiffs' request for declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 for causes of action arising under the Fourteenth Amendment to the United States Constitution and the VRA, 52 U.S.C. § 10101. Jurisdiction for Plaintiffs' claims under the Fourteenth Amendment to the U.S. Constitution is based upon 42 U.S.C. § 1983 and 28 U.S.C. § 1331. Jurisdiction for Plaintiffs' claim for attorney's fees is based on 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988(b)

**ANSWER: The Representative admits jurisdiction is proper but denies the remaining allegations in Paragraph 8 and denies that Plaintiffs are entitled to any relief.**

9. Venue is proper in this district under 28 U.S.C. § 1391(b) because all Defendants reside in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

**ANSWER: The Representative admits venue is proper in the Northern District of Illinois but denies the remaining allegations in Paragraph 9.**

10.     The General Assembly used data from the ACS five-year estimates for 2015-2019 and "other election data" to draw the boundaries for the districts used to elect members of the General Assembly.

**ANSWER: The Representative admits the General Assembly used ACS data among other data and input in drawing the June 2021 Plan.**

### III.     PARTIES

11.     Plaintiff Julie Contreras is a registered voter of Latina heritage residing within House District 60 and Senate District 30 under the June 2021 and SB 927 plans.  In the June 2021 Plans, House District 60 is overpopulated by 0.1%, and Senate District 30 is Overpopulatedby 2.1%.  Plaintiff Contreras is injured by residing in districts that are unconstitutionally malapportioned in the June 2021 Plans.

**ANSWER: The Representative lacks knowledge or information to form a belief about the truth of the allegations in Paragraph 11 regarding Plaintiff Contreras. The Representative denies the June 2021 Plan was unconstitutionally malapportioned.**

12.     Plaintiff Irvin Fuentes is a registered voter of Latino heritage residing within House District 1 and Senate District 1 under the June 2021 and SB 927plans. In the June 2021Plans, House District 1 is overpopulated by 4.3%, and Senate District 1 is overpopulated by 3.7%. Plaintiff Fuentes is injured by residing in districts that are unconstitutionally malapportioned in the June 2021 Plans.

**ANSWER: The Representative lacks knowledge or information to form a belief about the truth of the allegations in Paragraph 12 regarding Plaintiff Fuentes. The Representative denies the June 2021 Plan was unconstitutionally malapportioned.**

5

13.     Plaintiff Abraham Martinez is a registered voter of Latino heritage residing within House District 86 and Senate District 43 under the June 2021 and SB 927 Plans.

**ANSWER: The Representative lacks knowledge or information to form a belief about the truth of the allegations in Paragraph 13. The Representative further asserts that no answer is required as Plaintiff Martinez has been dismissed.**

14.     Plaintiff Irene Padilla is a registered voter of Latina heritage residing within House District 6 and Senate District 3 under the June 2021 and SB 927 plans. In the June 2021Plans, House District 6 is Overpopulated by 9.6%, and Senate District 3 is Overpopulated by 12.3%. Plaintiff Padilla is injured by residing in districts that are unconstitutionally malapportioned in the June 2021 Plans.

**ANSWER: The Representative lacks knowledge or information to form a belief about the truth of the allegations in Paragraph 14 regarding Plaintiff Padilla. The Representative denies the June 2021 Plan was unconstitutionally malapportioned.**

15.     Plaintiff Rose Torres is a registered voter of Latina heritage residing within House District 24 and Senate District 12 under the June 2021 and SB 927 plans. The SB 927 Plans configure the adopted House District in which she resides so as to dilute the Latino vote and deprive her of a meaningful opportunity to participate in the political process and election of representatives from that district.

**ANSWER: The Representative lacks knowledge or information to form a belief about the truth of the allegations in Paragraph 15 regarding Plaintiff Torres' heritage and residence. The Representative denies SB 927 dilutes the Latino vote and deprives Plaintiff of a meaningful opportunity to participate in thepolitical process and election of representatives from that district.**

16.    Plaintiff Cristina Flores is a registered voter of Latina heritage residing within House District 3 and Senate District 2 under the June 2021 and SB 927 plans. The SB 927 Plans configure the adopted House District and Senate District in which Plaintiff Flores resides so as to dilute the Latino vote and deprive her of a meaningful opportunity to participate in the political process and election of representatives from those districts.

**ANSWER: The Representative lacks knowledge or information to form a belief about the truthof the allegations in Paragraph 16 regarding Plaintiff Flores. The Representative denies SB 927 dilutes the Latino vote and deprives Plaintiff of a meaningful opportunity to participate in thepolitical process and election of representatives from that district.**

17.      Plaintiff Gabriel Perez is a registered voter of Latino heritage residing in House District 24 and Senate District 12 under the SB 927 plans. The SB 927 Plans configure the adopted House District in which Plaintiff Perez resides so as to dilute the Latino vote and deprive him of a meaningful opportunity to participate in the political process and election of representatives from that district.

**ANSWER: The Representative lacks knowledge or information to form a belief about the truthof the allegations in Paragraph 17 regarding Plaintiff Perez. The Representative denies SB 927 dilutes the Latino vote and deprives Plaintiff of a meaningful opportunity to participate in thepolitical process and election of representatives from that district.**

18.      Plaintiff Jose Alcala is a registered voter of Latino heritage residing in House District 21 and Senate District 11 under the SB 927 Plans. The SB 927 Plans configure the adopted House District and Senate District in which Plaintiff Alcala resides so as to dilute the Latino vote and deprive him of a meaningful opportunity to participate in the political process and election of representatives from those districts. Plaintiff Alcala is further injured by the race-

based redistricting of adopted House District 21 and Senate District 11 in the SB 927 Plans.

**ANSWER: The Representative lacks knowledge or information to form a belief about the truthof the allegations in Paragraph 18 regarding Plaintiff Alcala. The Representative denies SB 927 dilutes the Latino vote and deprives Plaintiff of a meaningful opportunity to participate in the political process and election of representatives from that district. Representative denies SB 927 was race based.**

19.     Plaintiff Laura Murphy is a registered voter of Latina heritage residing in House District 3 and Senate District 2 under the SB 927 Plans. The SB 927 Plans configure the adopted House District and Senate District in which Plaintiff Murphy resides so as to dilute the Latino vote and deprive her of a meaningful opportunity to participate in the political process and election of representatives from those districts.

**ANSWER: The Representative lacks knowledge or information to form a belief about the truthof the allegations in Paragraph 19 regarding Plaintiff Murphy. The Representative denies SB 927 dilutes the Latino vote and deprives Plaintiff of a meaningful opportunity to participate in thepolitical process and election of representatives from that district.**

20.     Plaintiff Ivan Medina is a registered voter of Latino heritage residing in House District 39 and Senate District 20 under the SB 927 Plans. The SB 927 Plans configure the adopted House District in which Plaintiff Medina resides so as to dilute the Latino vote and deprive him of a meaningful opportunity to participate in the political process and election ofrepresentatives from that district.

**ANSWER: The Representative lacks knowledge or information to form a belief about the truth of the allegations in Paragraph 20 regarding Plaintiff Medina. Representative denies SB 927 dilutes the Latino vote and deprives Plaintiff of a meaningful opportunity to**

participate in the political process and election of representatives from that district.

21.    Plaintiff Troy Hernandez is a registered voter of Latino heritage residing in House District 24 and Senate District 12 under the SB 927 Plans. The SB 927 Plans configure the adopted House District in which Plaintiff Hernandez resides so as to dilute the Latino vote and deprive him of a meaningful opportunity to participate in the political process and election of representatives from that district.

**ANSWER: The Representative lacks knowledge or information to form a belief about the truthof the allegations in Paragraph 21 regarding Plaintiff Hernandez. The Representative denies SB 927 dilutes the Latino vote and deprives Plaintiff of a meaningful opportunity to participate in the political process and election of representatives from that district.**

22.    Plaintiff Alfredo Calixto is a registered voter of Latino heritage residing in House District 39 and Senate District 20 under the SB 927 Plans. The SB 927 Plans configure the adopted House District in which Plaintiff Calixto resides so as to dilute the Latino vote and deprive him of a meaningful opportunity to participate in the political process and election of representatives from that district.

**ANSWER:  Representative lacks knowledge or information to form a belief about the truth of the allegations in Paragraph 22 regarding Plaintiff Calixto. Representative denies SB 927 dilutes the Latino vote and deprives Plaintiff of a meaningful opportunity to participate in the political process and election of representatives from that district.**

23.    Plaintiff Maria Gneich is a registered voter of Latina heritage residing in House District 22 and Senate District 11 under the SB 927 Plans. The SB 927 Plans configure the adopted Senate District in which Plaintiff Gneich resides so as to dilute the Latino vote and deprive her of a meaningful opportunity to participate in the political process and election of representatives from

that district. Plaintiff Gneich is further injured by the race-based redistricting of adopted Senate District 11 in the SB 927 Plans.

**ANSWER: Representative lacks knowledge or information to form a belief about the truth of the allegations in Paragraph 23 regarding Plaintiff Gneich. Representative denies SB 927 dilutes the Latino vote and deprives Plaintiff of a meaningful opportunity to participate in thepolitical process and election of representatives from that district. The Representative denies SB 927 was race based.**

24.     Plaintiff Puerto Rican Bar Association of Illinois ("PRBA") is a professional association of Latino lawyers with members throughout Illinois. Plaintiff PRBA is a multipurpose organization, and its goals include influencing legislation and policies relevant to the common interests of Latino lawyers in the State of Illinois; advocating for diversity in the judiciary, the legal profession, and the legislature; ensuring that elections are conducted securelyand fairly; and promoting civic education and political participation in the Latino community. Individual members of Plaintiff PRBA include Latino registered voters of Illinois who reside in SB 927 adopted voting districts that have the effect of diluting their voting strength, and SB 927 adopted voting districts where Defendants have used race as a predominant factor in determiningthe districts' boundaries.

**ANSWER: Representative lacks knowledge or information to form a belief about the truth of the allegations in Paragraph 24 related to Plaintiff PRBA and its individual members. The Representative denies race was used as a predominant factor in determining the districts' boundaries in SB 927.**

25.     Plaintiff Hispanic Lawyers Association of Illinois (HLAI) is a professional association of Latino lawyers with members throughout Illinois. Plaintiff HLAI is a multipurpose

organization and its goals include promoting the common interests of Latino lawyers in Illinois, ensuring that elections are conducted securely and fairly; empowering of the Hispanic community through the support of its community organizations; and promoting legal education and civil rights among Hispanic attorneys and the community. Individual members of Plaintiff HLAI include Latino registered voters of Illinois who reside in SB 927 adopted voting districts that have the effect of diluting their voting strength, and SB 927 adopted voting districtswhere Defendants have used race as a predominant factor in determining the districts' boundaries.

**ANSWER: The Representative lacks knowledge or information to form a belief about the truth of the allegations in Paragraph 25 related to Plaintiff HLAI and its individual members. The Representative denies race was used as a predominant factor in determining the districts' boundaries in SB 927.**

26.    All individual Plaintiffs and members of Plaintiffs PRBA and HLAI are injuredby residing in districts in plans—the June 2021 Plans—that are unconstitutionally malapportioned because of Defendants' failure to use a population basis to apportion districts.

**ANSWER: The Representative denies the allegations contained in Paragraph 26 of the Plaintiff's Second Amended Complaint.**

27.    Defendant Illinois State Board of Elections ("the Board") supervises the administration of registration and election laws throughout Illinois under Article III, Section 5 of the Illinois Constitution and 10 ILCS 5/1A-1, *et seq*., ensuring that elections in Illinois are conducted in accordance with all applicable laws.  The Board will supervise the administration of the 2022 general election for the Illinois Senate and Illinois House of Representatives.

**ANSWER: The Representative admits the allegations contained in Paragraph 27 of the Complaint.**

11

28.     Defendant Catherine S. McCrory is a member of the Illinois State Board of Elections and is sued in her official capacity. In this capacity, Ms. McCrory supervises the administration of registration and election laws throughout Illinois. Ms. McCrory will supervise the administration of the 2022 general election.

**ANSWER: The Representative admits the allegations contained in Paragraph 28 of the Complaint.**

29.     Defendant Rick S. Terven, Sr. is a member of the Illinois State Board of Elections and is sued in his official capacity. In this capacity, Mr. Terven supervises the administration of registration and election laws throughout Illinois.   Mr. Terven will supervise the administration of the 2022 general election.

**ANSWER: The Representative admits the allegations contained in Paragraph 29 of the Complaint.**

30.     Defendant Ian K. Linnabary is the Chair of the Illinois State Board of Elections and is sued in his official capacity. In this capacity, Mr. Linnabary supervises the administration of registration and election laws throughout Illinois. Mr. Linnabary will supervise the administration of the 2022 general election.

**ANSWER: The Representative admits the allegations contained in Paragraph 30 of the Complaint.**

31.     Defendant Casandra B. Watson is the vice chair of the Illinois State Board of Elections and is sued in her official capacity. In this capacity, Ms. Watson supervises the administration of registration and election laws throughout Illinois. Ms. Watson will supervise the administration of the 2022 general election.

**ANSWER: Representative admits the allegations contained in Paragraph 31 of the Plaintiff's**

12

Complaint.

32.     Defendant William J. Cadigan is a member of the Illinois State Board of Elections and is sued in his official capacity.  In this capacity, Mr. Cadigan supervises the administration of registration and election laws throughout Illinois.  Mr. Cadigan will supervise the administration of the 2022 general election.

**ANSWER: The Representative admits the allegations contained in Paragraph 32 of the Complaint.**

33.     Defendant Laura K. Donahue is a member of the Illinois State Board of Elections and is sued in her official capacity. In this capacity, Ms. Donahue supervises the administrationof registration and election laws throughout Illinois. Ms. Donahue will supervise the administration of the 2022 general election.

**ANSWER: The Representative admits the allegations contained in Paragraph 33 of the Plaintiff's Complaint.**

34.     Defendant William M. McGuffage is a member of the Illinois State Board of Elections and is sued in his official capacity. In this capacity, Mr. McGuffage supervises the administration of registration and election laws throughout Illinois.  Mr. McGuffage will supervise the administration of the 2022 general election.

**ANSWER: The Representative admits the allegations contained in Paragraph 34 of the Complaint.**

35.     Defendant Don Harmon is a member of the General Assembly and is sued in his official capacity as President of the Illinois Senate.

**ANSWER: Representative admits the allegations contained in Paragraph 35 of the Complaint.**

13

36.     Defendant the Office of the President of the Illinois Senate is the office of the presiding officer of the Illinois Senate, as designated by Article IV, Section 6(b) of the Illinois Constitution.

**ANSWER: The Representative admits the allegations contained in Paragraph 36 of the Complaint.**

37.     Defendant Emanuel Christopher Welch is a member of the General Assembly and is sued in his official capacity as Speaker of the Illinois House of Representatives.

**ANSWER: Representative admits the allegations contained in Paragraph 37 of the Plaintiff's Second Amended Complaint.**

38.     Defendant the Office of the Speaker of the Illinois House of Representatives is the office of the presiding officer of the Illinois House of Representatives, as designated by Article IV, Section 6(b) of the Illinois Constitution.

**ANSWER: The Representative admits the allegations contained in Paragraph 38 of the Complaint.**

39.     Defendants Don Harmon, the Office of the President of the Illinois Senate, Emanuel Welch, and the Office of the Speaker of the Illinois House of Representatives ("Legislative Defendants") presided over the Illinois General Assembly in the redistricting process that resulted in the passage of redistricting plans in June 2021 and August 2021.

**ANSWER: The Representative admits President Harmon was the presiding officer of the Illinois Senate and that Speaker Welch was the presiding officer of the Illinois House of Representatives when the June 2021 and August 2021 Plans were passed, but denies any remaining allegations in Paragraph 39.**

14

40.     During all times mentioned in this complaint, Defendants and their agents were acting under color of law: under color of the state constitution, statutes, laws, rules, regulations, customs, and usages of the State of Illinois, the Illinois General Assembly, and the Illinois State Board of Elections.

**ANSWER: Whether a person is acting under color of law is a legal conclusion for which no answer is required.**

## IV. FACTS

### The 2021 Redistricting Process in Illinois

41.     The Illinois Constitution provides dates for the 2021 redistricting cycle. ILL. CONST. art. IV, § 3(b). If a new legislative redistricting map is not passed by the General Assembly and signed into law by the governor before June 30 in the year following the decennial census, the task of redistricting falls to a Legislative Redistricting Commission (the "Redistricting Commission") to be created on or before July 10. *Id.* If the Redistricting Commission fails to file a plan on or before August 10, the Supreme Court must submit the names of two persons, not of the same political party, to the Secretary of State on or beforeSeptember 1. *Id.*

**ANSWER: The Representative responds that the Illinois Constitution speaks for itself and denies any allegation inconsistent with the Illinois Constitution or its interpretation by the Illinois Supreme Court.**

42.     On or before September 5, the Secretary of State must publicly and randomly choose the name of one of the two persons nominated by the Illinois Supreme Court to serve asthe ninth member of the Redistricting Commission. ILL. CONST. art. IV, § 3(b). On or before October 5, the newly constituted commission must file a redistricting plan with the Secretary ofState. A plan so chosen will have the force and effect of law. *Id.*

15

**ANSWER: The Representative responds that she admits the Illinois Constitution speaks for itself and denies any allegation inconsistent with the Illinois Constitution or its interpretation by the Illinois Supreme Court.**

43. On March 17, 2021, the General Assembly began holding virtual hearings to solicit public feedback on the redistricting process in Illinois.

**ANSWER: The Representative admits the allegations contained in Paragraph 43 of the Plaintiff's Complaint.**

44. On May 21, 2021, the General Assembly proposed draft representative and legislative redistricting maps. On May 25, 2021, and May 26, 2021, the Illinois House and Senate held virtual hearings to solicit feedback on the proposed redistricting maps.

**ANSWER: The Representative admits the allegations contained in Paragraph 44 of the Complaint.**

45. On May 27, 2021, House and Senate Democrats issued a press release announcing the release of updated maps. For the first time, the General Assembly explained that the maps were generated using five-year ACS data and "other election data." However, there was no explanation of how the General Assembly used ACS estimates and "other election data" to populate representative and legislative districts. There was also no disclosure of either the estimated populations of the various representative and legislative districts or demographic breakdowns of these districts.

**ANSWER: The Representative admits the House and Senate Democrats issued a press release. The Representative denies the remaining allegations in Paragraph 45 of the Complaint.**

46.     Early on May 28, 2021, with only one hour's notice, House and Senate Democrats scheduled hearings to allow public comment on the updated maps. Constituents and community advocacy organizations complained about the lack of notice and protested the fact that the General Assembly had neither given the public the underlying methodology used to populate representative and legislative districts nor provided them with time to analyze the underlying data and methodology used to create the maps.

**ANSWER: The Representative admits the House and Senate held hearings and the hearings met the requirements of House and Senate Rules and the requirements of the Illinois Constitution. The Representative denies the remaining allegations in Paragraph 46 of the Complaint.**

47.     Late that evening, the General Assembly passed House Bill 2777 and SenateFloor Amendment 1 and sent the June 2021 Plans to Governor Pritzker for approval.

**ANSWER: The Representative admits the allegations contained in Paragraph 47 of the Complaint.**

48.     The June 2021 Plans measure total population using five-year ACS estimated data — not P.L. 94-171 actual enumeration data.  The current redistricting plans are therefore not in compliance with the Fourteenth Amendment's one-person, one-vote mandate.

**ANSWER: The Representative admits the June 2021 Plan used five-year ACS data and not P.L. 94-171 data as the United States Census Bureau had not released the P.L data at the time the June 2021 plan was enacted. The Representative denies the remaining allegations in Paragraph 48 of the Complaint.**

49.     On June 4, 2021, the governor signed House Bill 2777.

**ANSWER: The Representative admits the allegations contained in Paragraph 49 of the**

**Plaintiff's Second Amended Complaint.**

50.     On August 12, 2021, the Census Bureau released P.L. 94-171 data in legacy format. The legacy-format data confirmed that the June 2021 Plans are malapportioned beyond tolerable limits, with a maximum deviation for the House of 20.3% and a maximum deviation for the Senate of 29.9%.

**ANSWER: The Representative admits the Census Bureau released P.L. 94-171 data in legacy format on August 12, 2021. The Representative denies the remaining allegations in Paragraph 50 of the Complaint.**

### P.L. 94-171 Redistricting Data

51.     The United States Constitution requires an "actual Enumeration" of every person living in the United States to take place every ten years. U.S. CONST. art. I, § 2.

**ANSWER: The Representative responds that the United States Constitution speaks for itself and denies any allegation in Paragraph 51 inconsistent with the Constitution or its interpretation by the Federal Courts.**

52.     The decennial count of the national population is used to allocate seats in the United States House of Representatives to states based on the "whole number of persons in each State." U.S. CONST. amend. XIV, § 2.

**ANSWER: The Representative responds that the United States Constitution speaks for itself and deny any allegation in Paragraph 52 inconsistent with the Constitution or its interpretation by the Federal Courts.**

53.     P.L. 94-171, enacted in 1975, "directs the Census Bureau to make special preparations to provide redistricting data needed by the fifty states. Within a year following Census Day, the Census Bureau must send the data agreed upon to redraw districts for the state legislature

to each state's governor and majority and minority legislative leaders." The P.L. 94-171 redistricting data provides the decennial count data by small area geography and includes tabulations by major racial/ethnic groups.

**ANSWER: The Representative responds that P.L. 94-171 speaks for itself.**

54. Following the release of the P.L. 94-171 redistricting data, states use the data to draw district lines that comply with the one-person, one-vote standard.

**ANSWER: The Representative lacks information and belief to form an opinion as to the truth of what all states do.**

55. In order to comply with the one-person, one-vote standard, the General Assembly's representative and legislative districts must be "substantially equal in population." Historically and traditionally, P.L. 94-171 data has been used for purposes of determining whether representative and legislative districts are in compliance with the one-person, one-votestandard.

**ANSWER: The allegation regarding compliance with the one person, one vote standard makes a legal conclusion for which no answer is required. The Representative admits P.L data has historically and traditionally been used in Illinois for redistricting districts.**

56. However, on April 13, 2020, the Bureau announced a new Census timeline that accounted for delays created by the COVID-19 pandemic (the "COVID-19 Plan"), among other reasons. The new timeline included postponed dates for collecting and processing data.

**ANSWER: The Representative admits the allegations contained in Paragraph 56 of the Plaintiff's Second Amended Complaint.**

57. On February 12, 2021, because of these delayed processing dates, the Bureau announced that "it will deliver the Public Law 94-171 redistricting data to all states by Sept. 30, 2021. COVID-19-related delays and prioritizing the delivery of the apportionment results delayed

the Census Bureau's original plan to deliver the redistricting data to the states by March31, 2021." Press Release, U.S. Census Bureau, Census Bureau Statement on Redistricting Timeline (Feb. 12, 2021) (available at https://www.census.gov/newsroom/press-releases/2021/statement-redistricting-data-timeline.html) (last visited June 10, 2021).

**ANSWER: The Representative admits the allegations contained in Paragraph 57 of the Plaintiff's Complaint.**

58.     Although the Bureau did not plan to release redistricting data in final form until September 30, 2021, "[s]tates, as well as the public, [were scheduled to receive] the data they need to begin redistricting by August 16." U.S. Census Bureau, 2020 Census Updates (June 8, 2021) (available at https://www.census.gov/programs-surveys/decennial-census/decade/2020/2020-census-main.html) (last visited June 10, 2021).

**ANSWER: The Representative admits the allegations contained in Paragraph 58 of the Plaintiff's Complaint.**

<u>The Inadequacy of ACS Estimates for Redistricting Purposes</u>
**Population Estimates vs. Enumeration**

59.     P.L. 94-171 data and ACS estimates have different purposes and different collection methodologies.  P.L. 94-171 data is based on the decennial census's actual enumeration of the population. The ACS is an ongoing, yearly, sample survey by the Bureau that collects detailed demographic information including ancestry, citizenship, educational attainment, income, language proficiency, migration, disability, employment, and housing characteristics from approximately 2.5 percent of U.S. households.  ACS data are an estimate of population characteristics based on sample data, and not a count of U.S. citizens and non-U.S. citizens.

**ANSWER: The Representative admits the allegations contained in Paragraph 59 of the Plaintiff's Complaint.**

60.     ACS data are not used to determine whether voting districts are equipopulous and comply with the one-person, one-vote constitutional requirement. Rather, "in the overwhelming majority of cases, jurisdictions have equalized total population, as measured by the decennial census" total population enumeration.  *Evenwel v. Abbott*, 136 S. Ct. 1120, 1125 (2016).

**ANSWER: The Representative states that *Evenwel v Abbot* speaks for itself and denies any allegation in Paragraph 60 that is inconsistent with *Evenwel*. Representative denies the remaining allegation in Paragraph 60 of the Complaint.**

61.     ACS data are not available for census blocks, the smallest geographical units used in redistricting. Rather, ACS estimates are available only at the "block group" level. Block groups typically contain between 600 and 3,000 people.[2] Although the ACS is designed to provide reliable estimates using one year of data for areas with populations over 65,000, which includes all states and many counties, multiple years of data must be aggregated in order to See United States Census Bureau, Glossary, https://www.census.gov/programs-  surveys/geography/about/glossary.html [https://perma.cc/A8JT-Y8Z8 ] (last visited on May 6, 2021) obtain data for smaller areas, such as block groups.  The ACS does not produce data for census blocks because the populations in question are too small to estimate accurately. Only an enumeration can measure the population of census blocks.

**ANSWER: The Representative lacks knowledge or information sufficient to form a belief about the truth of why ACS does not produce data for the census blocks. The Representative admits the remaining allegations in Paragraph 61 of the Complaint.**

### Timeliness

62.     ACS data are released in one-year and five-year estimates. One-year estimates are available for populations of at least 65,000. The Bureau combines five consecutive years of ACS

data to produce multiyear estimates for geographic areas with fewer than 65,000 residents.

**ANSWER: The Representative admits the allegations contained in Paragraph 62 of the Plaintiff's Second Amended Complaint.**

63.     Because one-year estimates are not suitable for populations under 65,000, redistricting maps drawn with ACS data, such as the June 2021 Plans, require the use of five-year estimates.

**ANSWER: The Representative denies the allegations contained in Paragraph 63 of the Plaintiff's Complaint.**

64.     Five-year ACS estimates are not current for purposes of determining whether districts comply with the one-person, one-vote standard. Eighty percent of the data from the 2015-2019 ACS five-year survey was between two and five years old by Census Day, April 1, 2020.

**ANSWER: The Representative lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 64 of the Complaint.**

65.     P.L. 94-171 actual enumeration data captures a snapshot in time (i.e., thepopulation on April 1, 2020).

**ANSWER: The Representative admits the allegations contained in Paragraph 65 of the Plaintiff's Second Amended Complaint.**

**SB 927 Plans**

66.     Section 2 of the VRA, 52 U.S.C. § 10301(a), applies nationwide and prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]"  A violation of Section 2 is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity

than other members of the electorate to participate in the political process and to elect representatives of their choice." § 10301(b). Section 2 is a permanent provision of the VRA.

**ANSWER: The Representative responds that the Voting Rights Act speaks for itself and denies any allegation in Paragraph 66 inconsistent with the Voting Rights Act or its interpretation by the Federal Courts.**

67.    On August 26, 2021, the General Assembly began holding hearings to solicit community feedback on a new districting plan. It released the SB 927 plans to the public on August 30, 2021, scheduling and holding a hearing to solicit community feedback on the SB 927 plans on the same day.

**ANSWER: The Representative responds that SB 927 is an amendment to House Bill 2777, not a "new" plan. Representative admits the remaining allegations in Paragraph 67 of the Complaint.**

68.    On August 31, 2021 the General Assembly passed the SB 927 plans, and the governor signed SB 927 on September 24, 2021.

**ANSWER: The Representative admits the allegations contained in Paragraph 68 of the Plaintiff's Complaint.**

69.    The SB 927 redistricting scheme for electing members of the General Assembly violates Section 2 because it dilutes the voting strength of Latino voters in Illinois and denies them an equal opportunity to participate in the political process.

**ANSWER: The Representative denies the allegations contained in Paragraph 69 of the Plaintiff's Complaint.**

70.    In the adoption of SB 927, Defendants engaged in intentional racial gerrymandering in violation of the United States Constitution and Section 2 of the VRA. Defendants purposefully

23

excluded Latino residents from certain districts based on race as apredominant factor, absent a compelling state interest.

**ANSWER: The Representative denies the allegations contained in Paragraph 70 of the Plaintiff's Complaint.**

71.     Between 2010 and 2020 the Latino population in Illinois experienced extraordinary growth.   Although the state's overall population decreased slightly, the number ofLatinos in Illinois increased from 2,027,578 to 2,337,410, an increase of 309,832 persons. As aresult, Latinos grew as a share of Illinois' total population, increasing from 15.8% of the total population in 2010 to 18.2% in 2020.

**ANSWER: The Representative lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 71 due to the Census Bureau's differential privacy requirements and changes to the Census questions from 2010 to 2020.**

72.     Similarly, the Latino citizen voting age population ("LCVAP") in Illinoisincreased significantly from 698,445 to 1,015,250, an increase of 316,805 persons.  As a percentage of Illinois' total citizen voting age population ("CVAP"), Latinos grew fromapproximately 8% of CVAP to 11.2%.

**ANSWER: Representative admits the Latino citizen voting age population in Illinois increased as estimated by the ACS 5-year estimates for 2005-2009 compared to those for 2015-2019, which is data Plaintiffs allege is unreliable. Representative denies the remaining allegations in Paragraph 72 of the Complaint.**

73.     Given the growth of the Latino population of Illinois in both absolute and relative terms, the growth of the LCVAP both in absolute and relative terms, the geographic concentration of the Latino population, and the overall decrease in Illinois' total population, one might have

expected Defendants and the General Assembly to have created a districting plan thatreflects the growth and increasing political importance of the Latino community by creating more Latino opportunity districts (districts that contain at least 50% LCVAP and afford a geographically compact Latino population an equal opportunity to elect a candidate of choice). That is not what happened.

**ANSWER: The Representative denies the allegations contained in Paragraph 73 of the Plaintiff's Complaint.**

74.    The General Assembly did not merely fail to create more Latino opportunity districts, it created fewer of them. In the Illinois Senate, the number of Latino opportunity districts decreased from three in the General Assembly's 2011 redistricting plan ("Benchmark Plan") to two in the SB 927 Plan, and, in the Illinois House, the number of Latino opportunity districts decreased from five in the Benchmark Plan to four in the SB 927 Plan. If elections areheld under the SB 927 redistricting plans, approximately 3.4% of Illinois House and Senate districts will be Latino opportunity districts. This percentage does not compare favorably with the Latino community's share of Illinois' CVAP, approximately 11.21%.   This disparity is relevant to whether—and tends to suggest that—the SB 927 redistricting plans violate Section 2of the VRA.

**ANSWER: The Representative denies the allegations contained in Paragraph 74 of the Plaintiff's Complaint.**

75.    The Latino population of Illinois is sufficiently geographically compact tocomprise the majority of citizen voting age persons in nine house districts and four senatedistricts.

**ANSWER: The Representative denies the allegations contained in Paragraph 75 of the Plaintiff's Complaint.**

**House District 3**

76.     Legislative Defendants dismantled an existing Latino opportunity district, House District 3, in the Benchmark Plan. Under the Benchmark Plan, House District 3 contained 58.7% Latino citizen voting age population.

**ANSWER: The Representative denies the allegations contained in Paragraph 76 of the Plaintiff's Complaint.**

77.     Under the SB 927 plans, House District 3 contains 48.1 % LCVAP.   The Defendants and the General Assembly moved district 3's boundaries north to exclude heavily Latino areas just south of the district. Defendants' failure to include even a small part of the heavily Latino neighborhoods just south of the district, without substantially changing District 3's boundaries, had the effect of depriving Latino voters of a Latino opportunity district.

**ANSWER: The Representative denies the allegations contained in Paragraph 77 of the Plaintiff's Complaint.**

**House District 4**

78.     A Latino opportunity district could have been created near House District 4.

**ANSWER: The Representative denies the allegations contained in Paragraph 78 of the Plaintiff's Complaint.**

79.     Under the SB 927 plans, House District 4 contains 45.4% LCVAP.

**ANSWER: The Representative denies the allegations contained in Paragraph 79 of the Plaintiff's Complaint.**

80.     Defendants failed to create a LCVAP-majority district when they could have added areas near House District 4 to create a Latino citizen voting age population-majority district, depriving Latino voters of an equal opportunity to elect representatives in House District4.

**ANSWER: The Representative denies the allegations contained in Paragraph 80 of the Plaintiff's Complaint.**

### House District 21

81.     A Latino opportunity district could have been created near House District 21 in the SB 927 Plan. House District 21, formerly House District 23 in the Benchmark Plan, was renumbered in the SB 927 Plan. Under the Benchmark Plan, former House District 23 contained 44.5% LCVAP.

**ANSWER: Representative denies the allegations contained in Paragraph 81 of the Plaintiff's Complaint.**

82.     Under the SB 927 Plan, House District 21 contains 42.9% LCVAP. Including larger parts of Berwyn and Cicero in the northern part of the district would create a Latino opportunity district.   Defendants' failure to do so had the effect of depriving Latino voters of an equal opportunity to elect representatives of choice.

**ANSWER: The Representative denies the allegations contained in Paragraph 82 of the Plaintiff's Complaint.**

83.     By moving Latinos into other districts and out of House District 21, SB 927 uses race as a predominant factor to allocate Latino voters into and out of House District 21.

**ANSWER: The Representative denies the allegations contained in Paragraph 83 of the Plaintiff's Complaint.**

### House District 24

84.     A Latino opportunity district could have been created near House District 24 in the SB 927 Plan. House District 24, formerly House District 2 in the Benchmark Plan, was renumbered in the SB 927 Plan. Under the Benchmark Plan, former House District 2 contained 42.6% LCVAP.

27

**ANSWER: The Representative denies the allegations contained in Paragraph 84 of the Plaintiff's Complaint.**

85.    Under the SB 927 Plan, Defendants and the General Assembly removed large portions of McKinley Park and Back of the Yards from House District 24. Under SB 927, House District 24 contains a LCVAP of 43.9%. Retaining and expanding these areas, would have created a Latino opportunity district. Defendants' failure to do so had the effect of depriving Latino voters of an equal opportunity to elect representatives of choice.

**ANSWER: The Representative denies the allegations contained in Paragraph 85 of the Plaintiff's Complaint.**

## House District 39

86.    A Latino opportunity district could have been created near House District 39.

**ANSWER: The Representative denies the allegations contained in Paragraph 86 of the Plaintiff's Complaint.**

87.    Under the SB 927 Plan, House District 39 contains a LCVAP of 45.3%.

**ANSWER: The Representative denies the allegations contained in Paragraph 87 of the Plaintiff's Complaint.**

88.    Defendants failed to create a LCVAP-majority district when they could have added areas near House District 39 to create a Latino citizen voting age population-majority district. Defendants' failure to do so had the effect of depriving Latino voters of an equal opportunity to elect representatives of choice.

**ANSWER: The Representative denies the allegations contained in Paragraph 88 of the Plaintiff's Complaint.**

## Senate District 2

89.     A Latino opportunity district could have been created near Senate District 2. Under the SB 927 plans, District 2 has a LCVAP 46.8%.

**ANSWER: The Representative denies the allegations contained in Paragraph 89 of the Plaintiff's Complaint.**

90.     By making House Districts 3 and 4, which are nested within Senate District 2, into Latino citizen voting age population-majority house districts, Defendants could have madeSenate District 2 into a Latino CVAP-majority district. Defendants' failure to do so had the effect of depriving Latino voters of an equal opportunity to elect representatives of choice.

**ANSWER: The Representative denies the allegations contained in Paragraph 90 of the Plaintiff's Complaint.**

**Senate District 11**

91.     Legislative Defendants dismantled a Latino opportunity district near Senate District 11 in the SB 927 Plan. Senate District 11, formerly Senate District 12 in the Benchmark Plan, was renumbered in the SB 927 Plan. Under the Benchmark Plan, former Senate District 12 contained 54.7% LCVAP.

**ANSWER: The Representative denies the allegations contained in Paragraph 91 of the Plaintiff's Complaint.**

92.     The incumbent in Senate District 11, formerly Senate District 12, is Senator Steven M. Landek, a White non-Latino Democrat.

**ANSWER: The Representative admits the allegations contained in Paragraph 92 of the Plaintiff's Complaint.**

93.     Under the Benchmark Plan, former House Districts 23 and 24 were nested within Mr. Landek's former Senate District 12. Former House District 23 contained 44.5% LCVAP, and

29

former House District 24 contained 66.3% LCVAP.

**ANSWER: The Representative admits House District 23 and 24 were in Senate District 12 in the 2011 Plan. The Representative denies the remaining allegations in Paragraph 93 of the Complaint.**

94.     Under the SB 927 Plan, House Districts 21 (formerly 23 in the Benchmark) and House District 22 are nested within Mr. Landek's current Senate District 11. House District 21 (formerly 23) contains 42.9% LCVAP, and House District 22 contains 52.7% LCVAP.

**ANSWER: The Representative admits House Districts 21 and 22 are nested in Senate District 11 in SB 927. The Representative denies the remaining allegations in Paragraph 94.**

95.     Legislative Defendants changed the nested house district composition of Senate District 11 in SB 927 from the Benchmark nesting in a manner that replaced a house district (24) with more than 60% LCVAP with one that had just above 50% LCVAP (22). Additionally, Legislative Defendants not only failed to raise LCVAP in House District 21 (formerly 23) in the SB 927 Plan from the Benchmark Plan, but also lowered the percentage of Latino citizen voting age population in that district.

**ANSWER: The Representative denies the allegations contained in Paragraph 95 of the Plaintiff's Complaint.**

96.     By re-nesting the house districts that comprise Senator Landek's district and lowering the LCVAP of House District 21, Legislative Defendants used race as a predominate factor to protect a White non-Latino incumbent Democrat.

**ANSWER: The Representative denies the allegations contained in Paragraph 96 of the Plaintiff's Complaint.**

97.     By moving Latinos into other districts and out of Senate District 11, SB 927 uses

30

race as a predominant factor to allocate Latino voters into and out of Senate District 11. SB 927 thereby discriminates against voters on the basis of race in Senate District 11 in violation of the Fourteenth Amendment to the United States Constitution.

**ANSWER: The Representative denies the allegations contained in Paragraph 97 of the Plaintiff's Complaint.**

98.     Defendants' dismantling of Senate District 11 had the effect of depriving Latino voters of an equal opportunity to elect representatives of choice.

**ANSWER: The Representative denies the allegations contained in Paragraph 98 of the Plaintiff's Complaint.**

**Racially Polarized Voting**

99.     Elections to the General Assembly, including district elections in the areas in and around House Districts 3, 4, 21, 24, and 39, and Senate Districts 2 and 11, are characterized by racially polarized voting.

**ANSWER: The Representative denies the allegations contained in Paragraph 99 of the Plaintiff's Complaint.**

100.     Latino voters in Illinois, including those in and around House Districts 3, 4, 21, 24, and 39, and Senate Districts 2 and 11, are politically cohesive.

**ANSWER: The Representative admits Latino votes are politically cohesive for voting for the Latino candidate of choice. The Representative admits the Latino candidate of choice is not always a Latino candidate. The Representative admits Latinos have been successful in electing the Latino candidate of choice under the 2011 Plan and will be under SB 927.**

101.     Non-Latino voters, including those in and around House Districts 3, 4, 21, 24, and 39, and Senate Districts 2 and 11, vote sufficiently as a bloc to enable them—in the absence of

special circumstances, such as the Latino candidate running unopposed—to defeat the Latino voters' preferred candidates in Illinois, including the areas in which LCVAP-majority districts can be created.

**ANSWER: The Representative denies the allegations contained in Paragraph 101 of the Plaintiff's Complaint.**

### History and Effects of Discrimination

102.    The State of Illinois has a long history of discriminating against and disenfranchising qualified Latino voters.

**ANSWER: The Representative denies the allegations contained in Paragraph 102 of the Plaintiff's Complaint.**

103.    Latinos in Illinois have been subject to widespread official and unofficial discrimination for many years, affecting their ability to participate in the political process.

**ANSWER: The Representative denies the allegations contained in Paragraph 103 of the Plaintiff's Complaint.**

104.    Latinos in Illinois continue to bear the effects of discrimination in such areas as education, employment, housing, and health, which depresses their socioeconomic status and hinders their participation in the political process.

**ANSWER: The Representative denies the allegations contained in Paragraph 104 of the Plaintiff's Complaint.**

105.    The SB 927 Plans interact with social and historical conditions to cause an inequality in the opportunity of Latino voters to elect representatives of choice as compared to White non-Latino voters.

**ANSWER: The Representative denies the allegations contained in Paragraph 105 of the**

Plaintiff's Complaint.

106.     Unless the relief requested in this cause is granted, Plaintiffs will suffer denial of equal rights and protection, and a dilution of their statutorily protected right tovote. Plaintiffs have no adequate remedy at law. They have suffered, and continue to suffer, immediate and irreparable injury in the deprivation of an equal opportunity to vote and to electcandidates of choice.

**ANSWER: The Representative denies the allegations contained in Paragraph 106 of the Plaintiff's Second Amended Complaint and denies Plaintiffs are entitled to any relief.**

## V.     CAUSES OF ACTION

### First Cause of Action
**(Equal Protection Clause of the 14th Amendment
to the United States Constitution— Malapportionment)**

107.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

**ANSWER: The Representative incorporates her answers to Paragraphs 1 to 106 as though fully restated herein as her answer to Paragraph 107 of the Complaint.**

108.     This cause of action arises under 42 U.S.C. § 1983 and the Fourteenth Amendment, Section 1, to the Constitution of the United States, which provides in pertinent part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.".

**ANSWER: The Representative denies Plaintiffs have plead a cause of action under the Fourteenth Amendment. The remaining allegations in Paragraph 108 call for a legal conclusion for which no answer is required. The Representative further denies a violation of**

the Fourteenth Amendment.

109.    The Equal Protection Clause requires that the representative and legislative districts used to elect members of the General Assembly be substantially equal in population. *See Reynolds v. Sims*, 377 U.S. 533, 569 (1964) ("We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral statelegislature must be apportioned on a population basis.").

**ANSWER: The Representative states the allegations in Paragraph 109 call for a legal conclusion for which no answer is required. The Representative further denies a violation of the Equal Protection Clause.**

110.    The General Assembly enacted representative and legislative plans using five-year ACS data, which provide only population estimates.  The General Assembly did not use P.L. 94-171 data from the 2020 Census, which contains an enumeration of the population.

**ANSWER: The Representative denies the allegations contained in Paragraph 110 of the Plaintiff's Complaint.**

111.    The General Assembly has failed to comply with its constitutional obligation to enact districts that are sufficiently equipopulous as measured by P.L. 94-171 data.

**ANSWER: The Representative denies the allegations contained in Paragraph 111 of the Plaintiff's Complaint.**

112.    The June 2021 Plans are therefore malapportioned and violate the one-person, one-vote standard, in violation of the Fourteenth Amendment to the United States Constitution.

**ANSWER: The Representative denies the allegations contained in Paragraph 112 of the Plaintiff's Complaint.**

<u>**Second Cause of Action**</u>

**(Equal Protection Clause of the 14th Amendment**

34

to the United States Constitution – Racial Gerrymandering)

113.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

**ANSWER: The Representative incorporates her answers to Paragraphs 1 to 112 as though fully restated herein as her answer to Paragraph 113 of the Complaint.**

114.    This cause of action arises under the Fourteenth Amendment, Section 1, to the Constitution of the United States.

**ANSWER: The Representative denies a violation of the Fourteenth Amendment as contained in Paragraph 114 of the Plaintiff's Complaint.**

115.    The SB 927 Plans use race as a predominant factor to allocate Latino voters into and out of House District 21.

**ANSWER: The Representative denies the allegations contained in Paragraph 115 of the Plaintiff's Complaint.**

116.    The SB 927 Plans use race as a predominant factor to allocate Latino voters into and out of Senate District 11.

**ANSWER: The Representative denies the allegations contained in Paragraph 116 of the Plaintiff's Complaint.**

117.    The use of race as the predominant factor in SB 927's configurations of House District 21 and Senate District 11 is not narrowly tailored to serve a compelling state interest.

**ANSWER: The Representative denies the allegations contained in Paragraph 117 of the Plaintiff's Second Amended Complaint.**

118.    Defendants have no compelling interest in use of race as a predominant factor for allocating voters in the SB 927 Plans.

**ANSWER: The Representative denies she used race as a predominant factor in creating the SB 927 Plan, and further responds that the allegations in Paragraph 118 make a legal conclusion for which no response is required.**

119.    Accordingly, Defendants' enactment and use of the boundaries for House District 21 and Senate District 11 in the SB 927 Plans discriminate against individual Plaintiffs and members of organizational Plaintiffs PRBA and HLAI on the basis of race and violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

**ANSWER: The Representative denies the allegations contained in Paragraph 119 of the Plaintiff's Second Amended Complaint.**

<u>Third Cause of Action</u>
**(Section 2 of the Voting Rights Act of 1965,
52 U.S.C. § 10301)**

120.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

**ANSWER: The Representative incorporates her answers to the Paragraphs 1 to 119 as fully restated herein as her answer to Paragraph 120 of the Complaint.**

121.    The SB 927 Illinois House and Senate Plans adopted and implemented by Defendants for the 2021 election for members of the General Assembly will result in the denial or abridgement of the right to vote of individual Plaintiffs and organizational Plaintiffs PRBA's and HLAI's members on account of their race, color, or ethnicity, by having the effect of dilutingtheir voting strength as minorities in Illinois.

**ANSWER: The Representative denies the allegations contained in Paragraph 121 of the Plaintiff's Complaint.**

122.    The SB 927 Illinois House and Senate Plans do not afford Plaintiffs an equal

opportunity to participate in the political process and to elect representatives of choice and deny individual Plaintiffs and members of organizational Plaintiff PRBA the right to vote in elections without distinction of their race, color, or ethnicity in violation of 52 U.S.C. § 10301, in adopted House Districts 3, 4, 21, 24, and 39, and in adopted Senate Districts 2 and 11.

**ANSWER: The Representative denies the allegations contained in Paragraph 122 of the Plaintiff's Complaint.**

**ATTORNEY'S FEES**

123.    In accordance with 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988(b), Plaintiffs are entitled to recover reasonable attorney's fees, expenses, and costs.

**ANSWER:  The Representative denies the allegation in Paragraph 123 and denies that Plaintiffs are entitled to any relief.**

**DEFENDANT-INTERVENOR'S AFFIRMATIVE DEFENSES**

Defendant-Intervenor for her affirmative defenses, states as follows:

**FIRST AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because they lack standing to bring the causes of action asserted in the Second Amended Complaint.

**SECOND AFFIRMATIVE DEFENSE**

The September Map was signed into law by Governor Pritzker on September 24, 2021. The September Map supersedes the June Map. As a result, the June Map will never be used for any election. All of Plaintiffs' claims related to the June Map are therefore moot.

Respectfully submitted,
ANGELICA GUERRERO-CUELLAR

By:    */s/ Veronica Bonilla-Lopez*
       Veronica Bonilla-Lopez
       *One of the Petitioner- Defendant's Attorneys*

Veronica Bonilla-Lopez (ARDC# 6281050)
Tiffany Nelson-Jaworski (ARDC #6278126)
DEL GALDO LAW GROUP, LLC
1441 S. Harlem Ave.
Berwyn, IL 60402
vblopez@dlglawgroup.com
jaworski@dlglawgroup.com
(708) 222-7000/(708) 222-7001 Fax