# Exhibit 1

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JULIE CONTRERAS, *et al,* | |
| Plaintiffs, | Case No. 21-cv-03139 |
| v. | Circuit Judge Michael B. Brennan |
| | Chief District Judge Jon E. DeGuilio |
| ILLINOIS STATE BOARD OF | District Judge Robert M. Dow, Jr. |
| ELECTIONS, *et al.,* | |
| Defendants. | Pursuant to 28 U.S.C. § 2284(a) |

**BRIEF FOR *AMICI CURIAE* NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC., CHICAGO WESTSIDE BRANCH NAACP, AND NAACP CHICAGO SOUTHSIDE**

_____

**STATEMENT OF INTEREST**

*Amici curiae* are non-profit, non-partisan organizations that have a demonstrated interest in protecting the fundamental rights of Black voters under the Voting Rights Act of 1965 ("VRA") and the Reconstruction Amendments to the U.S. Constitution. In pursuing that interest, *Amicus* NAACP Legal Defense and Educational Fund, Inc. litigates in the area of election law and voting rights law, while *Amici* Chicago Westside Branch NAACP, and NAACP Chicago Southside work to register and educate voters and encourage them to participate actively in the democratic process. In Illinois, *Amici* have worked arduously to realize the protections of the VRA and the Constitution, and to ensure that the voices of Illinois' Black voters are heard at the polls and in the redistricting process. *Amici* submit this brief to help the Court appreciate and understand the negative impact of Illinois's

dilutive state legislative redistricting plan, Senate Bill ("S.B.") 927, on Black communities in Illinois.

A list of *Amici* appears in the **Appendix**.

## INTRODUCTION

In S.B. 927, which was passed by the Illinois General Assembly on August 31, 2021 and signed into law on September 24, 2021 (the "September Redistricting Plan") Defendant members of the Illinois legislature ("Legislative Defendants") established new boundaries for state House and Senate districts that resulted in the loss of numerous districts comprised of a majority of racial minority voters ("majority-minority districts"), despite the significant decline in the white population throughout the state. Chicago's Westside and Southside communities, which have the highest concentrations of Black people in the state, bore the brunt of these losses. In those parts of the city, as well as surrounding areas of Cook County that have large Black communities, Legislative Defendants reduced the Black voting-age population ("VAP") to a minority in a total of seven House districts and four Senate districts where Black voters had formerly been in the majority ("majority-Black districts"). Eliminating these districts was unnecessary to satisfy the Fourteenth Amendment's "one-person one-vote" requirement. Moreover, for decades, these districts have allowed Black Illinoisians to have a voice on issues that affect them. Preserving these districts as majority-Black, as the remedial plan proposed by *Amici* does, is essential to ensure compliance with Section 2 of the Voting Rights Act of 1965 ("Section 2") and guarantee Black voters an equal opportunity "to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

## ARGUMENT

In assessing whether the September 2021 Redistricting Plan proffered by Defendants remedies the claims asserted by the *Contreras* Plaintiffs in this matter,

this Court must ensure that the plan does not dilute the votes of Illinois' Black citizens in violation of Section 2 of the VRA or unconstitutionally elevate race as a factor in redistricting decisions to the detriment of Black voters. Unfortunately, as compared to the legislative plan adopted after the 2010 Census, the post-2020 Census adopted plan reduces the voting strength of Black voters by eliminating a total of (a) seven majority-Black House districts and (b) four majority-Black Senate districts. This reduction in majority-Black districts—from 16 House districts and eight Senate districts in the 2011 plan to nine in the House and four in the Senate in the September Redistricting Plan—was unnecessary to ensure rough equality of population under the federal constitution. It also was carried out without adequate analysis of the VRA implications and despite evidence that voting in the Chicago area continues to be polarized along racial lines.

To remedy the unjustified elimination of these majority-Black legislative districts, *Amici* offer a proposed remedial plan, attached hereto as **Exhibit A**, which restores six of the seven eliminated majority-Black Illinois House districts and two of the eliminated majority-Black Senate districts. Evidence of ongoing racially polarized voting in the areas included in these districts indicate that majority-Black districts continue to be vital to ensure that Black voters have an equal opportunity to elect their preferred candidates to the Illinois legislature. The changes required to return these districts to compliance with Section 2 are modest and impact a total of only 18 out of the state's 118 House districts. Moreover, the changes *Amici* propose do not conflict with the remedy proposed by the *Contreras* Plaintiffs in this case: the plan proposed herein incorporates the proposed alternative districts offered by the *Contreras* Plaintiffs.

Considering these issues and the need to remedy all of Defendants' Section 2 and constitutional violations at this stage of the instant litigation is in the interest of justice because it enhances Black Illinoisians ability to participate in the political

3

process on an equal footing with other voters and serves judicial economy by avoiding the need for additional litigation.

## I. ANY REMEDIAL PLAN MUST COMPLY WITH SECTION 2 OF THE VOTING RIGHTS ACT.

Section 2 prohibits vote dilution and demands that voters of color in Illinois have an equal opportunity "to participate in the political process and to elect candidates of their choice."[1] Section 2 imposes an affirmative obligation on Legislative Defendants to carefully assess whether they must draw districts to provide minority voters with an effective opportunity to elect their preferred candidates. Assessing minority voting opportunities entails attention not only to the demographic composition of districts, but also to other factors such as "participation rates and the degree of cohesion" among voters of a particular racial or ethnic group.[2]

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the U.S. Supreme Court set forth three pre-conditions indicating that a districting plan or voting system results in vote dilution. These preconditions, referred to as the "*Gingles* preconditions," are met when: (1) an alternative districting plan can be drawn that includes one or more single-member districts where a minority community is sufficiently large and geographically compact to make up the mathematical majority of the district; (2) the minority group is politically cohesive in its support for preferred candidates; and (3) in the absence of majority-minority districts, candidates preferred by the minority group would usually be defeated because of political cohesion in the voting patterns

---

[1] *See Thornburg v. Gingles*, 478 U.S. 30, 34 (1986).

[2] Bernard Grofman, Lisa Handley & David Lublin, *Drawing Effective Minority Districts: A Conceptual Framework and Some Empirical Evidence*, 79 N.C. L. Rev. 1383, 1415 (2001).

of other voters in support of different candidates.[3] Together, the second and third *Gingles* preconditions are commonly referred to as racial bloc voting or racially polarized voting.[4] Both intentional vote dilution through the drawing of district lines for the purpose of disadvantaging minority voters, and facially neutral districting that has the result of diluting minority votes are prohibited by Section 2.[5]

If these three *Gingles* preconditions are met, a decisionmaker must then evaluate the "totality of circumstances" to determine whether minority voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[6] Courts consider several factors—such as the history of discrimination or the use of devices that restrict access to the ballot for candidates of color—to determine whether the right to vote of protected classes of voters has been impermissibly diluted.[7] Typically, when the

---

[3] *Gingles*, 478 U.S. at 50–51; *see also Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, 835 F. Supp. 2d 563, 580 (N.D. Ill. 2011).

[4] Racially polarized voting occurs when different racial groups vote as a bloc for different candidates. In a racially polarized election, for example, Black people vote together for their preferred (frequently, though not always, Black) candidate, and most non-Black voters vote usually for the opposing (typically, though not always, white) candidate.

[5] *Comm. for a Fair & Balanced Map*, 835 F. Supp. 2d at 580.

[6] 52 U.S.C. § 10301(b); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006); *Comm. for a Fair & Balanced Map*, 835 F. Supp. 2d at 580–81 (noting that "the court moves on to decide, based on the totality of the circumstances, whether a Section 2 violation has occurred […] considering […] the state's history of voting-related discrimination, the degree of racial polarization in voting, and" other factors explained in the totality of the circumstances) (internal citations omitted).

[7] Courts examine the "totality of the circumstances" based on the so-called "Senate Factors," named for the Senate Report accompanying the 1982 Voting Rights Act amendments in which they were first laid out. *Gingles*, 478 U.S. at 43–45. The Senate Factors are: (1) the extent of any history of discrimination related to voting; (2) the extent to which voting is racially polarized; (3) the extent to which the state or political subdivision uses voting practices that may enhance the opportunity for discrimination; (4) whether minority candidates have access to candidate slating processes; (5) the extent to which minority voters bear the effects of discrimination in areas of life like education, housing, and economic

*Gingles* factors are satisfied, plaintiffs are likely to establish a violation of Section 2 under the totality of circumstances.[8]

Here, Legislative Defendants failed to adequately evaluate whether preserving the benchmark majority-Black districts that had existed under the 2010 plan were necessary to the continued ability of Black voters to elect their preferred legislative representatives in Illinois. Dr. Allan Lichtman provided legislative testimony concerning whether there is a continued need for majority-minority districts upon which Defendants relied in developing their redistricting plan. In May 2021, Dr. Lichtman testified that racially polarized voting is a relic of the past in Illinois, but, as far as *Amici* are aware, he failed to support his conclusion with any formal, systematic, and methodologically-sound analysis.[9] Indeed, as discussed in more detail below, Dr. Lichtman based his observations on publicly available voter polling

---

[8] opportunity; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which minority people have been elected to public office; (8) whether elected officials are responsive to the needs of minority residents; and (9) whether the policy underlying the voting plan is tenuous. *Id.* at 36–37. However, "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 45 (citing S. Rep. No. 97–417, at 29 (1982)).

[8] Multiple federal courts have noted the proposition that once *Gingles* is satisfied, "it will be only the very unusual case in which the plaintiffs . . . have failed to establish a violation of § 2 under the totality of circumstances." *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993); *accord Baten v. McMaster*, 967 F.3d 345, 379 (4th Cir. 2020), *as amended* (July 27, 2020) ("where a plaintiff establishes the *Gingles* prerequisites, that plaintiff is likely to succeed under the totality of the circumstances"); *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015) (same); *Uno v. City of Holyoke*, 72 F.3d 973, 983 (1st Cir. 1995) (noting that *Gingles* preconditions "rise to an inference that racial bias is operating through the medium of the targeted electoral structure to impair minority political opportunities"); *NAACP v. City of Niagara Falls,* 65 F.3d 1002, 1019 n.21 (2d Cir. 1995) (same); *Clark v. Calhoun Cnty.*, 21 F.3d 92, 97 (5th Cir. 1994) (same).

[9] *See* Testimony of Dr. Allan Lichtman to the Joint Committee Redistricting Hearing, 102nd General Assembly (May 25, 2021), at 24–25, https://ilga.gov/house/committees/Redistricting/102RedistrictingTranscripts/HRED/2021052 5SP/Tuesday May 25 Hearing.pdf ("Lichtman Test.").

data and not on a statistical analysis of voting patterns based on actual election returns as required by *Gingles*.[10] Such a simplified and incomplete analysis cannot justify the elimination of VRA districts that for many decades have allowed Black voters in Illinois to have equal access to representation in the state legislature.

## II.   THE SEPTEMBER REDISTRICTING PLAN DILUTES THE VOTE OF BLACK VOTERS IN THE CHICAGO AREA.

In Illinois, based on present demographics, voting patterns, and other conditions, a redistricting plan that reduces the number of majority-Black districts from sixteen to nine would violate the text and spirit of the VRA. The available evidence and additional analysis performed by *Amici* suggests that each of the three *Gingles* preconditions is satisfied in Illinois, and based on the available evidence,[11] under the totality of the circumstances, Black voters have "less opportunity than other members of the electorate to participate in the political process and to elect candidates of their choice." 52 U.S.C. § 10301.

### A.   *Gingles* Precondition One: It is Possible to Draw Illinois's State Maps with 15 Majority-Black Opportunity Districts in the State House and 6 in the State Senate.

Defendants' September Redistricting Plan, which this Court has viewed as Defendants' proposed remedial map, unnecessarily reduces the number of majority-Black districts. In the September Redistricting Plan, seven previously majority-Black House districts and four previously majority-Black Senate districts now fall below 50 percent Black voting-age population ("BVAP"), measured by the VAP within each district that identifies as Black either alone or in combination with another race, but

---

[10] *See id.* at 26–28.

[11] *See*, *e.g.*, *Contreras* Pls' Proposed Alternative Remedial Plan and Statement in Supp. 25–39, ECF No. 135 (describing totality of circumstances evidence with respect to discrimination against Latino community in Chicago, much of which also affects Black people).

excluding those who identify as Hispanic or Latino.[12] Our analysis indicates that is possible to restore the Black voting strength in at least six of these House districts and two of these Senate districts with minimal changes. The map attached as **Exhibit A hereto** provide alternative boundaries from Defendants' plan for House Districts 6, 8, 9, 26, 28, and 38 and Senate Districts 3 and 14. As the map shows, with relatively modest adjustments to the September Redistricting Plan, it is possible to create districts that, based on 2020 Census data, are comprised of a majority of Black voters. Moreover, none of these changes render any of the districts substantially less compact than they are in the adopted plan, and several are more compact.

Thus, as demonstrated in the **attached** plan, the Black population in these six House and two Senate districts is sufficiently large and geographically compact to form a majority, satisfying the first *Gingles* precondition.[13]

---

[12] This measure of the Black population is sometimes designated "any part Black." This category, which the Census began using in 2000, counts as "Black" any person who self-identifies as Black alone or Black in combination with any other race or ethnicity. *See Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003), *superseded by statute on other grounds as recognized by Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1273 (2015) (The U.S. Supreme Court has held that where Black voters are the only minority group whose exercise of the franchise is at issue, "it is proper to look at *all* individuals who identify themselves as black."). Although the "any part Black" category sometimes includes those who identify as both Black and Hispanic or Latino, *Amici* have not included those who identify as Hispanic or Latino in their analysis of the Black population.

[13] In their assessment of the first *Gingles* precondition with respect to their proposed majority-Black districts, *Amici* have used VAP rather than citizen voting-age population ("CVAP"). *See Barnett v. City of Chicago*, 969 F. Supp. 1359, 1409 (N.D. Ill. 1997), *aff'd in part, vacated in part*, 141 F.3d 699 (7th Cir. 1998) ("While several circuits have adopted a citizenship voting age population ('CVAP') standard as the population benchmark for the purposes of the first *Gingles* prong, […] this Court sees no reason for revisiting this circuit's use of VAP as a benchmark."); *see also Contreras* Pls' Proposed Alternative Remedial Plan, ECF No. 135 (discussing the use of VAP versus CVAP for *Gingles* one and citing cases).

## B.     *Gingles* Preconditions Two & Three: Voting in Certain Elections in Illinois is Racially Polarized.

There is evidence to suggest that the second and third *Gingles* preconditions are satisfied in certain probative elections in Illinois. Indeed, with respect to *Gingles'* second precondition, Defendants' expert, Dr. Lichtman, admitted "overwhelming" minority cohesion in no uncertain terms: "Now, certainly minorities have remained cohesive behind candidates of their choice, which are typically minorities, but not always. There are occasionally white candidates who in competition with minorities are in fact the minority candidate of their choice but *there is no question about overwhelming minority cohesion.*"[14]

Recent elections evidence an ongoing pattern of racially polarized voting in elections across the state, including in the six House districts and two Senate districts identified above. An analysis of the 2019 Chicago mayoral race found that candidate preferences continue to be polarized along racial lines, with white voters as a bloc preferring different candidates from Black voters.[15] In the general election, in the precincts with a majority of Black voters ("majority-Black precincts"), Willie Wilson and Toni Preckwinkle, who both are Black people, were the candidates of choice; whereas, in the precincts with a majority of white voters ("majority-white precincts"), Jerry Joyce and Bill Daley, both of whom are white people, were the candidates of choice.[16] Looking at the two candidates who went on to the runoff,

---

[14] Lichtman Test., at 25 (emphasis added).

[15] Elections in jurisdictions that overlap with the geographic areas of the challenged districts are relevant to examining voting patterns. *See Comm. for a Fair & Balanced Map*, 835 F. Supp. 2d at 587 ("When examining evidence to determine polarized voting on a district-specific basis, we are not confined to elections solely within the district but can consider those in surrounding districts to determine voting patterns relevant to the challenged area.").

[16] Kumar Ramanathan, *How Did Chicago's Segregated Neighborhoods Vote in the Mayoral Election?,* Chi. Democracy Project, Nw. U. Pol. Sci. Dep't (Mar. 11, 2019),

Mayor Lori Lightfoot performed best in precincts of 50%–75% of white voters, while winning just 13.9% of the vote in majority-Black precincts, while Toni Preckwinkle found the most support in areas of Chicago with the lowest white population.[17] Because of Illinois's continuing patterns of voting along racial lines, Legislative Defendants should have been attuned to their obligations under Section 2 in the drawing of all statewide electoral maps. As the Supreme Court recently instructed: a "legislature undertaking a redistricting must assess whether the new districts it contemplates (not the old ones it sheds) conform to the [Voting Rights Act]'s requirements."[18]

Unfortunately, Defendants failed to take seriously the Supreme Court's guidance. In an effort to justify the elimination of majority-Black districts from the state legislative plan, Defendants have relied on the legislative testimony of Dr. Lichtman, who opined that because Black or other candidates of color have attracted white support, white-bloc voting no longer exists.[19] As noted above, in his testimony, Dr. Lichtman conceded that Black voters vote cohesively for their preferred candidates, meaning that there is no dispute that *Gingles* precondition 2 is satisfied.[20] In addition, Dr. Lichtman admitted that he had performed no analysis of the voting patterns in the districts actually drawn by Defendants.[21]

---

https://sites.northwestern.edu/chicagodemocracy/2019/03/11/race-segregation-mayor-2019-general/.

[17] *Id.*

[18] *Cooper v. Harris*, 137 S. Ct. 1455, 1471 (2017).

[19] *See* Lichtman Test., at 24–26.

[20] *Id.* at 25:3–9.

[21] *Id.* at 43 ("SENATOR MCCONCHIE: You did not make any determination as to whether these particular districts drawn will effectively elect minority candidates; is that accurate?" DR. LICHTMAN: I haven't seen the numbers on the districts . . .'"").

To reach his conclusion of a lack of white-bloc voting, Dr. Lichtman instead relied on a presentation of polling data from several high-profile recent races, including, among others, the 2019 Chicago mayoral race,[22] pointing to white voter support for Lori Lightfoot as evidence that white block voting no longer "usually . . . defeat[s] candidates supported by a . . . minority group." *Gingles*, 478 U.S. at 49. He failed, however, to examine whether Ms. Lightfoot was, in fact, the candidate supported by Chicago's Black community. However, as explained above, Black voters by and large preferred other candidates in the general election. Thus, contrary to Dr. Lichtman's assertion, white bloc voting may well have resulted in the defeat of the candidate preferred by Black voters in the 2019 Chicago mayoral race. Dr. Lichtman likewise relies heavily on President Barack Obama's success among white Illinoisians,[23] but he never even mentions, much less analyzes, how much Mr. Obama benefited from home state advantage or whether Mr. Obama sustained similar levels of support among white voters over time. Moreover, under *Gingles* "the results of a couple of elections do not discount the presence of racial bloc voting." *Teague v. Attala Cnty.*, 92 F.3d 283, 288 (5th Cir. 1996). Under *Gingles*, "[a] pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election." *Gingles*, 478 U.S. at 57. Likewise, "a showing that bloc voting is not absolute does not preclude a finding of racial polarization." *Id. Amici* agree with the *Contreras* Plaintiffs that Dr. Lichtman's analysis is incomplete.[24]

An analysis conducted by *Amici* on voting patterns in the six House districts and two Senate districts identified above, found that, in many parts of the Chicago

---

[22] *Id.* at 27.

[23] *Id.* at 26.

[24] *See Contreras* Pls' Proposed Alternative Remedial Plan 23 n.17, ECF No. 135.

area, racially polarized voting appears to persist. That analysis suggests that Black voters as a bloc continue to prefer particular candidates, and while some white voters will support those candidates in districts in which they are the minority, where they form a majority, white voters tend to elect candidates who are not the choice of Black voters. For example, a precinct-level analysis of the 2020 primary race in the Cook County State's Attorney election found that, county-wide, Kim Foxx, a Black woman, had the support of nearly 90% of Black voters and only about 30% of white voters. Moreover, in all six of the House districts and the two Senate identified above, voting was even more polarized, with white voter support for Ms. Foxx below 30% in all of those districts and below 20% in House districts 26, 28 and 38.[25]

Nevertheless, relying on Dr. Lichtman's incomplete analysis of voting patterns, Defendants adopted a redistricting plan that shed majority-Black districts that had long provided Black voters the opportunity to elect their preferred candidates. By ignoring patterns of voting along racial lines in the drawing of electoral maps and relying on unsupported assertions that, because certain Black-preferred candidates received support from white voters, majority-Black districts were no longer needed, Defendants failed to fulfill their legal obligations in the redistricting process.

---

[25] This analysis was performed using the Ecological Inference methodology, which has been widely accepted in Section 2 cases for analyzing racially polarized voting. *See, e.g.*, *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1003 (D.S.D. 2004); *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 387–88 (S.D.N.Y. 2004); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1402 (E.D. Wash. 2014); *see also* Kumar Ramanathan, *Breaking Down Kim Foxx's Win in the 2020 Primary*, Chi. Democracy Project, Nw. U. Pol. Sci. Dep't (Mar. 25, 2020), https://sites.northwestern.edu/chicagodemocracy/2020/03/25/kim-foxx-2020-primary-win/ (analyzing the general election in the 2020 State's Attorney race and finding that Kim Foxx received over 75% of votes in predominantly Black precincts while her opponent, Bill Conway, who is a white man, consistently outperformed her in precincts with a white voter population of 60% or more.).

### III. *AMICI'S* PROPOSED REMEDIAL PLAN ADDRESSES THE VRA VIOLATIONS OF THE LEGISLATURE'S ADOPTED PLAN.

The redistricting plan **attached** to this brief proposes one of many potential sets of alternative boundaries to House Districts 6, 8, 9, 26, 28, and 38, and Senate Districts 3 and 14, which restore the majority-Black VAPs in these districts. The remedial map proposed by *Amici* addresses the VRA violations of the Illinois Legislature's adopted September 2021 Redistricting Plan with respect to these districts. By restoring the majority-Black population in these districts, this proposed remedial plan protects against the dilution of Black voters' ability to participate in the electoral process on an equal footing with non-Black voters in the Chicago area.

The proposed remedial plan respects communities of interest in Chicago. The proposed districts are based on the shared social, economic, educational, infrastructure and other concerns of communities of interest, specifically, communities on the South and West Sides of Chicago. One of the starkest examples of the specific needs of Black voters in these communities that demand effective representation has been laid bare by the pandemic: although COVID-19 presented risks to the entire population, Black Illinois residents were disproportionately more likely to die of COVID-19, highlighting the health disparities that persist in Illinois and throughout the nation.[26]

Additionally, *Amici*'s proposed plan is consistent with the proposed plan put forward by the *Contreras* Plaintiffs. *Amici*'s plan requires no modifications to the

---

[26] María Inés Zamudio, *COVID-19 Deaths Are Rising in Chicago And Black Residents Remain the Most Likely to Die*, WBEZ Chi. (Nov. 20, 2020), https://www.wbez.org/stories/covid-19-deaths-are-rising-in-chicago-and-black-residents-remain-the-most-likely-to-die/31d4c1e6-666d-4bc6-9878-b5fbc5e9aecc; Asraa Mustafa & David Eads, *Black People Across Illinois Are Dying from COVID-19 at 3.4 Times the Rate of the White Population*, Chi. Rep. (Apr. 7, 2020), https://www.chicagoreporter.com/black-people-across-illinois-are-dying-from-covid-19-at-3-4-times-the-rate-of-the-white-population/.

boundaries of House Districts 3, 4, 21, 24, or 39, or Senate Districts 2 or 11, as those districts are modified in the *Contreras* Plaintiffs' proposed remedial plan.

Any redistricting following the 2020 Census, in short, should have been conducted with an awareness of all appropriate indicia of the ability of Black and Latino voters and other voters to participate equally in the democratic process. *Amici*'s proposed remedial plan, in combination with the *Contreras* Plaintiffs' plan, respects this basic principle.

## CONCLUSION

The September 2021 Redistricting Plan, Defendants' proposed remedial map, fails to satisfy Section 2 of the Voting Rights Act of 1965 because it dilutes the votes of Black Illinoisians and eliminates historically majority-Black districts without adequate evidence that the conditions that made those districts necessary in the first place no longer exist. As this Court considers a remedy for the legal violations raised by Plaintiffs in this litigation, it should also ensure that any remedial redistricting plan also serves Illinois's Black community and continues to provide Black voters an equal opportunity to elect their candidates of choice.

Dated: November 18, 2021

Respectfully submitted,

*s/ Alexa Van Brunt*

LEAH C. ADEN*
STUART C. NAIFEH*
NAACP LEGAL DEFENSE & EDUCATIONAL
    FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org

ALEXA VAN BRUNT
RODERICK & SOLANGE MACARTHUR
    JUSTICE CENTER
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-1336
a-vanbrunt@law.northwestern.edu

*Counsel for Amici Curiae*
**Pro hac vice* applications pending

14

*Of counsel*:

JANETTE LOUARD
ANTHONY ASHTON
ANNA KATHRYN BARNES
NATIONAL ASSOCIATION FOR THE
    ADVANCEMENT OF COLORED PEOPLE
    (NAACP)
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 581-5777
jlouard@naacpnet.org
aashton@naacpnet.org
abarnes@naacpnet.org

## APPENDIX: *AMICI CURIAE*

The **NAACP Legal Defense and Educational Fund, Inc. ("LDF")** is a non-profit, non-partisan law organization established under the laws of New York to assist Black and other people of color in the full, fair, and free exercise of their constitutional rights. Founded in 1940 under the leadership of Thurgood Marshall, LDF focuses on eliminating racial discrimination in political participation, education, economic justice, and criminal justice.

LDF has been involved in numerous precedent-setting cases relating to minority political representation and voting rights before state and federal courts, including lawsuits involving constitutional and legal challenges to discriminatory redistricting plans or those otherwise implicating minority voting rights. *See, e.g., Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021); *Rucho v. Common Cause*, 588 U.S. __, 139 S. Ct. 2484 (2019); *Benisek v. Lamone*, 585 U.S. __ (per curiam), 139 S. Ct. 783 (Mem) (2019); *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016); *Ala. Legis. Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015); *Shelby Cnty. v. Holder*, 570 U.S. 529 (2013); *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193 (2009); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006); *Georgia v. Ashcroft*, 539 U.S. 461 (2003); *Easley v. Cromartie*, 532 U.S. 234 (2001); *Bush v. Vera*, 517 U.S. 952 (1996); *Shaw v. Hunt*, 517 U.S. 899 (1996); *United States v. Hays*, 515 U.S. 737 (1995); *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831 (5th Cir. 1993) (en banc); *Chisom v. Roemer*, 501 U.S. 380 (1991); *Houston Lawyers' Ass'n v. Attorney Gen. of Texas*, 501 U.S. 419 (1991); *Thornburg v. Gingles*, 478 U.S. 30 (1986); *Beer v. United States*, 425 U.S. 130 (1976); *White v. Regester*, 422 U.S. 935 (1975) (per curiam); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); *Terry v. Adams*, 345 U.S. 461 (1953); *Schnell v. Davis*, 336 U.S. 933 (1949) (per curiam); *Smith v. Allwright*, 321 U.S. 649 (1944); *Kirksey v. Bd. of Supervisors*, 554 F.2d 139 (5th Cir. 1977); *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973).

The **Chicago Westside Branch NAACP** and the **NAACP Chicago Southside** serve as the Chicago area arms of the National Association for the Advancement of Colored People, one of the country's oldest racial justice organizations, which was founded on the goal of achieving an equitable society for African Americans and communities of color. The Westside and Southside NAACP work toward eliminating race-based discrimination and has done so for almost a century. Throughout their history, the Westside and Southside NAACP branches have actively fought for voting rights, and have invested significant resources in efforts to expand American democracy and increase participation in the electoral process.

# **EXHIBIT A**

## *Amici Curiae*'s Alternative Proposed Remedial Plan - House and Senate





**House District 6**

Map layers

Landmark Area
Landmark
Freeway/Highway
House Adopted
House Proposed

Miles
0        .5        1        1.5

# House District 8



# House District 9





# House District 26

## Map layers

Landmark Area
Landmark
Freeway/Highway
**House Adopted**
House Proposed

0    .5    1    1.5

Miles

# House District 28



# House District 38



# Amici Curiae's Proposed Alternative Redistricting Plan - Demographics

| District | Total Population | Voting Age Pop. | Latino VAP | % Latino VAP | NL Black VAP | % NL Black VAP | CVAP (Est.) | Latino CVAP | % Latino CVAP | NL Black CVAP | % NL Black CVAP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **House** | | | | | | | | | | | |
| 6 | 108,763 | 82,303 | 20624 | 25.06% | 42,709 | 51.89% | 63,274 | 7,699 | 12.17% | 39,192 | 61.94% |
| 8 | 106,570 | 80,548 | 11626 | 14.43% | 40,662 | 50.48% | 73,412 | 7,136 | 9.72% | 40,651 | 55.37% |
| 9 | 113,685 | 90,448 | 8440 | 9.33% | 46,392 | 51.29% | 76,263 | 5,708 | 7.48% | 43,566 | 57.13% |
| 26 | 105,356 | 88,056 | 5242 | 5.95% | 47,423 | 53.86% | 65,819 | 2,794 | 4.24% | 42,894 | 65.17% |
| 28 | 107,939 | 83,523 | 12123 | 14.51% | 46,023 | 55.10% | 79,684 | 8,408 | 10.55% | 49,999 | 62.75% |
| 38 | 109,369 | 85,189 | 5088 | 5.97% | 50,419 | 59.18% | 83,055 | 3,302 | 3.98% | 49,747 | 59.90% |
| **Senate** | | | | | | | | | | | |
| 3 | 211,957 | 169,123 | 25,098 | 14.84% | 86,265 | 51.01% | 110,367 | 9,364 | 8.48% | 67,869 | 61.49% |
| 14 | 218,310 | 171,598 | 17,965 | 10.47% | 92,764 | 54.06% | 164,811 | 12,875 | 7.81% | 96,977 | 58.84% |